**Ava BROWN, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 89–480.**

District of Columbia Court of Appeals.

Submitted May 3, 1990.

Decided July 10, 1990.

James B. Miles, appointed by this court, was on the brief, for appellant.

Jay B. Stephens, U.S. Atty., and John R. Fisher and Brenda J. Johnson, Asst. U.S. Attys., were on the brief, for appellee.

Before ROGERS, Chief Judge, NEWMAN, Associate Judge, and PRYOR, Senior Judge.

NEWMAN, Associate Judge:

Ava Brown appeals her conviction for malicious destruction of property stemming from an incident in which Brown smashed the front windows and door of her mother's home in an effort to get inside and take possession of her runaway son, who was then staying at his grandmother's home. Brown charges that the court erred by (1) ruling that as a matter of law the grandmother's refusal to turn over Brown's son was inadequate provocation for Brown's act of destruction, and (2) refusing to permit Brown to introduce evidence of provocation—specifically, that her mother had threatened on previous occasions to permanently remove Brown's son from her care by "institutionalizing" the boy. We reverse the conviction.

I

On Friday September 16, 1988, Lamar Brown, Ava Brown's twelve-year old son, ran away from home. His grandmother,

Ava Brown's mother, Joylette Young, found him on a street on September 23 and took him home with her, where she called his father. His father and mother were separated. Young testified that she did not notify Brown that she had found Brown's son, because Brown had no telephone and the boy insisted that he did not wish to return to his mother's home.

Ava Brown searched unsuccessfully for her son for ten days. She contacted the police and the Youth Division and talked to friends and neighbors. On Monday September 26th, sometime after 8:00 p.m., she contacted a friend of Lamar's named Antoine and asked him if he knew Lamar's whereabouts. Antoine told Brown that Lamar had been picked up from an area playground by his grandmother, Ms. Young.

At about 9:40 that evening, Ava Brown, with her other son, Javan, in tow, appeared at the front door of her mother's home seeking her son. Ms. Young told Brown that she could not have the boy, because Brown had been physically and mentally abusing him and he did not want to return home with her. Brown insisted that she be allowed to come in and get the boy. Young refused. Brown picked up a wrought iron chair from the front porch and began smashing windows and the front door in an attempt to gain entry, destroying three windows, curtains, blinds, and the panes in a fifteen light door in the process.

According to Brown, Young broke some of the windows from the inside with a broomstick. According to Young, she had a nightstick and did not break any windows with it, but only wielded the stick in an effort to keep Brown out of the house.

Young called the police and then left the house via the basement with Lamar in an attempt to reach Young's car while Brown was occupied breaking through the front door. As the pair reached Young's car, they were observed by Lamar's younger brother, Javan, who called out to Lamar to come to him and his mother. Brown left the porch in an attempt to stop them, but was restrained by neighbors and held on the ground until the police arrived.

At trial, Brown conceded all elements of the charge except malice, arguing that she had been provoked by (1) her mother's earlier threats to institutionalize the boy to remove him from her care, and (2) her mother's refusal to allow her access to her son after a ten-day search for the boy.

Concerning the former point, Brown was prevented by the court from testifying about the alleged threats on grounds that, as a matter of law, Brown's motivations for trying to enter the house were irrelevant. However, during cross-examination of Young in the rebuttal portion of the trial, Brown's counsel was permitted to ask Young whether she had ever made any such threats or, more specifically, whether she had sent the police to Brown's home on one occasion "to institutionalize" Lamar. Young denied both charges.

Concerning the latter point, the court said to the jury:

> You're instructed that as a matter of law it is not adequate provocation, justification, or excuse to damage or destroy property if somebody is not doing something that you think they should be doing, such as in this case, not turning over the defendant's son. As a matter of law, that is not sufficient justification or excuse to thereupon start destroying property.

Later, during its deliberations, the jury sent the court a note, reading:

> Judge Wolf, please clarify the definition of malice. Is premeditation required? Is malice possible if it occurs on the spur of the moment? To what extent does frustration play in determining malice? If we find that the defendant's perception of the situation at that moment was different from what we now know the situation to be, may we give weight to that in determining the issue of malice?

The court summoned counsel, read the note, and discussed his proposed answer to the jury's questions. Regarding the jury's question about frustration, the court told counsel:

> In answering the question about frustration, you might be very frustrated if a police officer gives you a ticket that you

don't think you deserve, but that does not give you the right to bust the windshield of the police car. And if your perception at the moment is that the ticket was unjustified, but you're wrong, it was totally justified, then to that extent your perception at that moment is irrelevant.

Defense counsel objected to this answer, saying:

I think you might ... indicate that a person might well be justified or adequately provoked, say, to enter someone's house if he knows there's a kidnap victim there screaming as opposed to running away from a scream and calling a police officer, to let the police officer come and knock the door down.

The court agreed to give such an example, saying "if you think someone is inside a house in physical danger, it might be adequate provocation to break down the door to go in to save them." However, the government objected on grounds that there was no evidence to support a finding that Brown's son was in physical danger. The court responded by saying that he would stress the need for the presence of "actual physical danger."

The court then proceeded to meet with the jurors and answer their questions as he had proposed to counsel. Regarding the matter of entering a house to rescue someone, the court said:

Suppose you thought someone was inside a house and you reasonably thought —I'm sorry—you actually thought that someone was inside the house and was in physical danger. Physical danger. If that thought that you had was a reasonable thought under the circumstances, then you might have the justification or excuse to break in the house and destroy some property in the process to save that person from actual physical harm.

The jury retired and eventually returned with a guilty verdict. Brown appeals, contending that the trial court erred by ruling and instructing the jury that her motives for attempting to enter her mother's house —namely, her fear that her son would not be returned to her—were irrelevant as a matter of law.

## II

■ Although provocation is a matter usually connected with the law of homicide, we have held that the malice required by D.C.Code § 22–403 (1981)[1] as an element of the charge of malicious destruction of property is the same as the malice required to make out a case of murder. *Carter v. United States*, 531 A.2d 956, 963–64 (D.C. 1987). Moreover, in defining malice under § 22–403, we adopted the definition offered by Perkins, CRIMINAL LAW 769–70 (2d ed. 1969), in which it was said that "malice in the legal sense imports (1) the absence of all elements of justification, excuse or recognized mitigation." *See Charles v. United States*, 371 A.2d 404, 411 (D.C.1977); *Thomas v. United States*, 557 A.2d 1296, 1299 (D.C.1989). Thus, provocation is a proper defense to the charge of malicious destruction of property, and we look to the doctrine of provocation as it has developed in the context of homicide, and elsewhere,[2] to guide us in deciding this case.

---

1. D.C.Code § 22–403 (1981) provides:
   Whoever maliciously injures or breaks or destroys, or attempts to injure or break or destroy, by fire or otherwise, any public or private property, whether real or personal, not his own, of the value of $200 or more, shall be fined not more than $5,000 or shall be imprisoned for not more than 10 years, or both, and if the value of the property be less than $200 shall be fined not more than $1,000 or imprisoned for not more than 1 year, or both.
   (1989).

2. We have also recognized provocation as a defense in unemployment compensation cases in-

volving termination for misconduct. *Williams v. District Unemployment Compensation Bd.*, 383 A.2d 345, 350 (D.C.1978).

In other non-homicide areas of the law, we have defined malice as intentional conduct done without provocation, justification, or excuse. *Perkins v. United States*, 446 A.2d 19, 22 (D.C. 1982) (malicious disfigurement under D.C.Code § 22–506). *See also Meyer v. Washington Times Co.*, 64 App.D.C. 218, 222, 76 F.2d 988, 992 (1935) (malicious interference with contract). Therefore, provocation would be a defense to charges in these areas of the law as well.

## A

Under the common law, the doctrine of provocation developed along the lines of fixed categories of conduct by the victim, paradigms of misbehavior, which the law recognized as sufficiently provocative to mitigate what would otherwise be malicious conduct by the defendant. Familiar examples of these categories of provocative conduct by the victim are adultery[3] and assault.[4] Traditionally, a defendant seeking to negate the malice element of the charge against her by showing provocation would have to present some evidence of provocative behavior by the victim.[5] However, such evidence would not automatically entitle the defendant to an instruction on a lesser included offense or an affirmative defense. First, the court would have to determine that the victim's conduct constituted legally adequate provocation,[6] *i.e.*, that it fit within one of the tried and true categories of provocative conduct like adultery or assault. Thus, in order to have the jury consider such evidence, the defendant either would have to present it in a form recognized as legally adequate by the court, or ask the court to recognize a new category of provocative conduct. In addition, rules were developed to keep certain types of conduct outside the fixed categories, and thus away from the jury, such as insulting words and gestures unaccompanied by other conduct.[7] Thus, under the common law, there grew up a process of pigeon-holing provocative conduct.

But the domination of provocation doctrine by fixed categories of recognized conduct has long been questioned by a number of commentators and courts. This questioning has developed into the modern view of provocation. Culminating in the formulation adopted in the Model Penal Code, the modern view has turned away from the rigid common law rules of fixed categories of conduct and toward the broader conception of provocation embodied in the phrase "extreme mental or emotional disturbance for which there is reasonable explanation or excuse." MODEL PENAL CODE ("MPC"), Pt. II § 210.3 (1980) at 60. Under this view, if there is evidence of extreme emotional distress, it is left to the trier of fact to determine whether, under the circumstances, there is a reasonable "explanation or excuse" for the defendant's conduct. *Id.* at 61.

The view expressed in the Model Penal Code has been said to have been anticipated by a 19th century decision of the Michigan Supreme Court, *Maher v. People*, 10 Mich. 212, 81 Am.Dec. 781 (1862).[8] Maher was charged with assault with intent to kill his wife's lover. On the day of the assault, he followed the pair to the woods, observed them enter the woods, waited for them to emerge, and then followed his victim to a saloon. Just before entering the saloon, he was told by an acquaintance that the two had intercourse the day before. Maher then entered the saloon and fired a shot at his victim's head, wounding and nearly killing him. The trial court refused to allow Maher to present evidence of provocation based on the alleged adultery and, on appeal, the Supreme Court took up the question of "what shall be considered in a law a reasonable or adequate provocation", *id.* at 220, for a homicide, saying:

> [O]n principle, the answer, as a general rule, must be, anything the natural tendency of which would be to produce ... a state of mind [in which passion dominates reason] in ordinary men, and which the jury are satisfied did produce it in the case before them.

*Id.* at 221. Thus, as the Supreme Court of Michigan formulated it, provocation may be any set of circumstances that would naturally arouse passion in and dominate the reason of an ordinary person and which, in the jury's view, did so with regard to the defendant in the case at hand. In revers-

---

3. C. Torcia, WHARTON'S CRIMINAL LAW ("Torcia") § 163 (14th ed. 1979).

4. *Id.* § 158.

5. *Id.* § 164 at 259.

6. *Id.* at 262.

7. *Id.* § 156.

8. S. Kadish, S. Schulhofer, M. Paulsen, CRIMINAL LAW AND ITS PROCESSES (4th ed. 1983) at 430.

ing Maher's conviction, the court offered as its rationale for adopting this flexible standard "the almost infinite variety of facts presented by the various cases as they arise [citation omitted]," *id.* at 222, and concluded that "[t]he law can not with justice assume, by the light of past decisions to catalogue all the various facts and combinations of facts which shall be held to constitute reasonable or adequate provocation." *Id.* at 222–23.

Yet, in rejecting this flexible view, that is just what the common law understood to do: catalogue the various ways in which an ordinary person might be moved by passion to extraordinary action. The entries in this catalogue seem to have been based largely on preconceived notions of what would provoke an ordinary person, and they soon hardened into the aforementioned rigid categories of what the law would accept as adequate provocation under any circumstances.[9] For example, Judge Manning, writing in dissent in *Maher,* took the view

that "the cause of provocation must occur in [the defendant's] presence," *id.* at 228, referring of course to the adulterous act. Similarly, Missouri took the position that "provocation must consist of personal violence.... There must be an assault upon the person." *State v. Starr,* 38 Mo. 270, 277 (1886). *See also People v. Harris,* 8 Ill.2d 431, 134 N.E.2d 315 (1956) (victim beat defendant with night stick); *State v. Ponce,* 124 W.Va. 126, 19 S.E.2d 221 (1942) (victim struck defendant and shoved him into rock pile). Other categories of conduct recognized by the common law as providing adequate provocation included mutual combat,[10] illegal arrest,[11] injury to a close relative,[12] and aggravated trespass, *i.e.,* trespass accompanied by assault or destruction of property.[13]

Over the years this traditional view of provocation as a set of rigid categories of recognized conduct has been abandoned by a growing number of state legislatures,[14]

---

**9.** MPC § 210.3 comment 5(a) at 57–61. *See also* W. LaFave & A. Scott, Criminal Law ("LaFave & Scott") § 76 at 574 (1972) ("There has been a tendency of the law to jell concerning what conduct does or does not constitute a reasonable provocation for purposes of voluntary manslaughter. Thus it is often held that a reasonable man may be provoked into passion when he (or a close relative) is hurt by violent physical blows, or is unlawfully arrested or discovers his spouse in the act of adultery; but that he can never be provoked by mere words or by trespasses to his property."); Torcia, § 164 at 259 ("If there is evidence of provocation in the case, the court must determine whether such provocation is recognized by the law as adequate.").

**10.** *State v. Adams,* 22 Del. 178, 65 A. 510 (1906); *Richardson v. Comm.,* 128 Va. 691, 104 S.E. 788 (1920).

**11.** *Elk v. United States,* 177 U.S. 529, 20 S.Ct. 729, 44 L.Ed. 874 (1900); *Davis v. State,* 204 Md. 44, 102 A.2d 816 (1954).

**12.** *People v. Rice,* 351 Ill. 604, 184 N.E. 894 (1933) (evidence that victim slapped defendant's child and later argued with defendant held to support conviction for voluntary manslaughter); *State v. Grugin,* 147 Mo. 39, 47 S.W. 1058 (1898) (father, on learning that his son-in-law had raped his young unmarried daughter, asked son-in-law why he did it and was told "I'll do as I damn well please"; father killed son-in-law; *held:* a jury question whether this was reasonable provocation for voluntary manslaughter);

*State v. Flory,* 40 Wyo. 184, 276 P. 458 (1929) (son-in-law, on learning that his wife's father had raped her, killed him; *held:* jury could find voluntary manslaughter).

**13.** *Croom v. State,* 85 Ga. 718, 11 S.E. 1035 (1890); *State v. Matthews,* 148 Mo. 185, 49 S.W. 1085 (1899).

**14.** *See e.g.,* Ark.Code Ann. 5–10–104 (Michie 1987) ("A person commits manslaughter if: (a) he causes the death of another person under circumstances that would be murder, except that he causes the death under the influence of extreme emotional disturbance for which there is reasonable excuse."); Conn.Gen.Stats. § 53a–55(a)(2) (1985); 11 Del.Code § 641 (1987 Repl. Michie) ("The fact that the accused intentionally caused the death of another person under the influence of extreme emotional distress is a mitigating circumstance, reducing the crime of murder in the first degree ... to the crime of manslaughter."); N.Y.Penal Law § 125.20(2) (McKinney's 1987) ("A person is guilty of manslaughter in the first degree when: ... (2) With intent to cause the death of another person, he causes the death of such person or of a third person under circumstances which do not constitute murder because he acts under the influence of extreme emotional disturbance."); Mont.Code Ann. 45–5–102 (1987) ("Criminal homicide constitutes mitigated deliberate homicide when a homicide which would otherwise be deliberate homicide is committed under the influence of extreme mental or emotional stress for which there is reasonable explanation or

courts,[15] and commentators,[16] with the result that the emerging "modern" view of provocation, expressed in the Model Penal Code as "extreme emotional distress," has now swung round to the view expressed over a century ago by the *Maher* court.

The rationale offered for the modern view is strikingly similar to that offered by Judge Christiancy, who, writing for the *Maher* court, said: "[t]he law can not with justice assume by the light of past decisions to catalogue all the various facts and combinations of facts which shall be held to constitute reasonable or adequate provocation." *Maher, supra,* 10 Mich. at 222–23. The Pennsylvania Supreme Court came to the same conclusion regarding the definition of provocation under its common law: "What is sufficient provocation for this purpose has not been exactly defined, and is probably incapable of exact definition, for it must vary with the myriad shifting circumstances of men's temper and quarrels. It is a concession to the infirmity of human nature, not an excuse for undue or abnormal irascibility, and, therefore to be considered in view of all circumstances."

*Commonwealth v. Pease,* 220 Pa. 371, 373, 69 A. 891, 892 (1908). Or, as the comment to § 210.3(1)(b) of the Model Penal Code puts it, "[The issue of provocation] cannot be resolved successfully by categorization of conduct. It must be confronted directly on the facts of each case."

## B

■ Our own law of provocation in the District of Columbia began with a general formulation similar to the modern view: to reduce murder to manslaughter "[i]t is only necessary to show that the killing was committed in the 'heat of passion' upon sufficient provocation. The test of sufficiency of such provocation is that which would cause an ordinary man, a reasonable man, or an average man, to become so aroused [as to kill another]." *Bishop v. United States,* 71 App.D.C. 132, 136–37, 107 F.2d 297, 302–03 (1939).[17] This formulation, which is binding on us, *M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971), does not provide specific categories of acceptable or unacceptable provocatory conduct. Rather, it rests on the general principle that what

excuse.); Utah Code Ann. § 76–5–205(1) (1989 Supp.) ("Criminal homicide constitutes manslaughter if the actor ... (b) Causes the death of another under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation or excuse.").

In 1957, England adopted the modern view of provocation as "evidence on which the jury can find that the person charged was provoked (whether by things done or by things said or by both together) to lose his self-control, the question whether the provocation was enough to make a reasonable man do as he did shall be left to be determined by the jury; and in determining that question the jury shall take into account everything both done and said according to the effect which, in their opinion, it would have on a reasonable man." Homicide Act of 1957, 5 & 6 Eliz. 2, ch. 11, Part I, § 3.

15. *People v. Valentine,* 28 Cal.2d 121, 139, 169 P.2d 1, 12 (1946) ("In the present condition of our law, *it is left to the jurors* to say whether or not the facts and circumstances in evidence are sufficient to lead them to believe that the defendant did, or to create a reasonable doubt in their minds as to whether or not he did, commit his offense under the heat of passion. The jury is further to be admonished by the court that this heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given

facts and circumstances.") (emphasis in original); *Commonwealth v. McCusker,* 448 Pa. 382, 389–90, 292 A.2d 286, 290 (1972) ("The ultimate test for adequate provocation remains whether a reasonable man, confronted with this series of events, became impassioned to the extent that his mind was 'incapable of cool reflection.'") (quoting *Commonwealth v. Colandro,* 231 Pa. 343, 350–51, 80 A. 571, 574 (1911)).

16. *See, e.g.,* LaFave & Scott, *supra,* at 574 ("In modern times, however, there seems to be a growing realization that what might or might not cause a loss of self control in a reasonable Englishman of a century ago might not necessarily produce the same reaction in the reasonable Anglo–American of today. As a consequence of this realization there may be a future trend away from the usual practice of placing the various provocatory conduct into pigeonholes.").

17. A later decision rendered the formulation thusly: "An unlawful killing in the sudden heat of passion ... is reduced from murder to manslaughter only if there was adequate provocation, such as might naturally induce a reasonable man in the passion of the moment to lose self-control and commit the act on impulse and without reflection." *Austin v. United States,* 127 U.S.App.D.C. 180, 188, 382 F.2d 129, 137 (1967).

constitutes sufficient provocation is that which would cause an ordinary, reasonable person to lose his or her self-control.[18]

■ Over the years we have held to this view of the law of provocation: could a reasonable juror, acting reasonably,[19] find (1) that the conduct at issue is such as would cause an ordinary, reasonable person to lose his or her self-control and act without reflection; and (2) if so, whether the person exposed to the conduct was in fact provoked by it. *See, e.g., West v. United States,* 499 A.2d 860 (D.C.1985) (as a matter of law, an unarmed victim's act of walking toward armed defendant while they exchanged words was not the sort of provocative act that would cause reasonable person to lose control and act without reflection); *Dean v. United States,* 377 A.2d 423, 427 (D.C.1977) ("Whatever passion was aroused by the rape of one of [the defendant's] prostitutes was under the circumstances clearly not of the sort which would cause a reasonable person to lose control and act without reflection."); *Harris v. United States,* 373 A.2d 590, 592 (D.C.1977) (belief that man who had raped the mother of one of defendants might be hiding in victim's house coupled with victim's act of shutting door in defendants' faces, as a matter of law, was not adequate provocation where defendants knew that victim was not the rapist); *Jamison v. United States,* 373 A.2d 594, 596 (D.C. 1977) (evidence insufficient for manslaughter instruction where defendant claimed he was provoked by the victim's repeated robberies of his father and himself, including a robbery on the night of the murder, but where defendant had ample time to reflect and cool down); *Morgan v. United States,* 363 A.2d 999, 1002–03 (D.C.1976) (general assertion of "emotional strain" at the time of the shooting unaccompanied by any facts showing provocation was insufficient for manslaughter instruction. *But see Ni-*

*cholson v. United States,* 368 A.2d 561, 565 (D.C.1977) (allegation by defendant that she was provoked by suspicion of past adulterous acts between the victim and her husband not legally adequate to amount to legal provocation since allegation was not of a sudden discovery of adulterous conduct). If there is sufficient evidence of provocation to go to the jury, the burden remains on the government to prove malice, *see Charles v. United States, supra,* 371 A.2d at 411, and to prove the absence of adequate provocation beyond a reasonable doubt. *Ruffin v. United States,* 524 A.2d 685, 710 (D.C.1987) (Mack, *Associate Judge,* concurring and dissenting), *cert. denied,* 486 U.S. 1057, 108 S.Ct. 2827, 100 L.Ed.2d 927 (1988) (quoting *United States v. Alexander,* 152 U.S.App.D.C. 371, 392, 471 F.2d 923, 944, *cert. denied,* 409 U.S. 1044, 93 S.Ct. 541, 34 L.Ed.2d 494 (1972)). *See also Myles v. United States,* 364 A.2d 1195, 1198 (D.C.1976) (government must disprove self-defense beyond a reasonable doubt).

C

■ Defense counsel strove to get his evidence of provocation before the jury. Initially, he attempted to present the theory that Brown was provoked by Young's refusal to turn over her son. This theory was thwarted by the trial court's ruling that, as a matter of law, Young's refusal to turn over Brown's son was inadequate provocation. We disagree. We cannot say that an ordinary, reasonable person, after searching for her son for ten days only to learn that he was staying with her own mother and that her own mother had not only failed to inform her of her son's whereabouts but also refused to return the boy to the custody of his own parent, could not have been so impassioned by these circumstances as to lose her self-control and, acting without reflection, destroy win-

---

**18.** *See also United States v. Wharton,* 139 U.S. App.D.C. 293, 301, 433 F.2d 451, 458 (1970); *Hart v. United States,* 76 U.S.App.D.C. 193, 195, 130 F.2d 456, 458 (1942); *Kinard v. United States,* 68 App.D.C. 250, 254, 96 F.2d 522, 526 (1938).

**19.** *Goddard v. United States,* 557 A.2d 1315, 1316 (D.C.1989) (a criminal defendant is entitled to a jury instruction on any issue fairly raised by the evidence, however weak, so long as a reasonable juror acting reasonably could credit the evidence) (citing *Mathews v. United States,* 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988)).

544

dows and a door in an attempt to get into her mother's house and retrieve her lost son. Moreover, there was sufficient evidence that Brown was so provoked by her mother's conduct to create a jury issue.

Constrained by the trial court's legal ruling, defense counsel next attempted to cast his client as one acting to protect the safety of a third party, *i.e.*, a rescuer. But, once again, Brown's defense was smothered by the trial court's instruction to the jury that it could consider the defense only if they found an actual physical danger to Brown's son. Given the complete lack of evidence of any such danger, that instruction fairly ended the matter.

Brown was not contending that there was actual physical danger to her child. What she was contending was that she was provoked by her mother's threats to remove her son from her custody by having him "institutionalized" and by her mother's refusal to turn the boy over to her after secreting him in her house. Once again, we cannot say, as a matter of law, that no reasonable juror acting reasonably could find that an ordinary, reasonable person faced with conduct along these lines might not be so impassioned as to lose her self-control and act without reflection to regain custody of the boy.

Brown was denied the opportunity to present evidence on this issue by the trial court's ruling that Brown's testimony concerning these alleged threats and Brown's motives in attempting to enter the house to prevent them from taking place was irrelevant. This limitation on the introduction of evidence, as well as the jury instructions implementing this ruling, each constitute reversible error.

*Reversed and remanded.*