Stanley SIMPSON, Appellant,

v.

UNITED STATES, Appellee.

No. 89–CF–1470.

District of Columbia Court of Appeals.

Argued June 9, 1992.
Decided Oct. 4, 1993.

Stephen I. Singer, Public Defender Service, with whom James Klein, Public Defender Service, Washington, DC, was on the brief, for appellant.

John R. Fisher, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., at the time the brief was filed, and Silvia L. Gonzalez and Elizabeth H. Danello, Asst. U.S. Attys., Washington, DC, were on the brief, for appellee.

Before TERRY and SULLIVAN, Associate Judges, and MACK, Senior Judge.

MACK, Senior Judge:

After a trial by jury, appellant was found not guilty on two counts of first-degree premeditated murder while armed [1] but convicted on two counts of second-degree murder while armed.[2] In this court he alleges that the trial court committed reversible error in (1) denying a requested defense instruction, and (2) permitting the government to impeach his testimony with an illegally obtained statement. Specifically, he argues that the trial court erred in ruling that there was no evidence of mitigation from which the jury could have concluded that he was guilty of manslaughter rather than murder, and in permitting, for impeachment purposes, the introduction of post-arrest statements elicited from him, intentionally, while he lay hos-

---

1. D.C.Code §§ 22–2401, –3202 (1989 Repl.).

2. D.C.Code §§ 22–2403, –3202 (1989 Repl.). Simpson was sentenced to consecutive prison terms of fifteen years to life for each count.

pitalized in the absence of counsel. We discuss, but find it unnecessary to conclusively rule as to his first claim of error, and find his second to have merit requiring reversal.

### The Crime

Shortly after midnight on January 6, 1988, appellant Stanley Simpson ("Simpson") called the security office at the Capitol City Inn, an emergency shelter for homeless families, and informed a special police officer that in Room 301, he had stabbed his two sons and himself. Two special police officers forced open the locked and chained door to Room 301, and found two small boys lying lifeless and bloody on a bed. Simpson was lying on the bed next to the boys, clutching his abdomen. Police and an ambulance team arrived soon thereafter. The medical examiner determined that the boys died as a result of stab wounds to the chest with internal hemorrhage.

When the police arrived on the scene, Simpson admitted that he killed his two sons, Dwayne Stephen Barnes, age 8, and Jerome Clayton Barnes, age 4,[3] and attempted to kill himself. He indicated where the knife would be found and it was recovered.

Mr. Simpson was arrested and taken by ambulance to the Medstar Unit at Washington Hospital Center suffering from four stab wounds, two to his chest below the heart and two to his abdomen. He received emergency treatment, and subsequently underwent a two-hour operation before being transferred to a hospital room where he was visited repeatedly by a detective. (*See* p. 377, *infra*).

### The Trial

After the government's opening statement, Simpson revealed that his defense would be that he killed his children in the heat of passion caused by his overwhelming sense of hopelessness and despair. He proffered evidence about personal circumstances involving his sons and the mother of his children and argued that *either* provocation *or* heat of passion could reduce murder to manslaughter.[4] The trial judge, relying on case language purportedly suggesting that provocation means "provocation by the victim"[5] and that "emotional strain" cannot defeat a showing of malice,[6] refused to allow appellant to argue in his opening statement to the jury that these personal circumstances showed he was guilty only of manslaughter.

The trial judge, however, did accept appellant's argument that he should be able to testify to, and present witnesses to corroborate, his state of mind and thus show that he committed second-degree rather than first-degree murder.

Thereafter evidence was produced that revealed that both of Simpson's sons, Dwayne and Jerome Barnes, were victims of cerebral palsy. Neither could feed, dress, or bathe himself. They attended Sharp Health School for handicapped children. Dwayne spoke only a few words, and never learned to walk independently but was always smiling. His chronological age was eight years, but due to his delayed mental and physical development he functioned as a two-year-old child. Jerome experienced similar developmental delays, but was learning to crawl on his belly. The boys shared one wheelchair, as the family could not afford to purchase another.

Simpson's relationship with Venita Barnes, his high school sweetheart and the boys' mother, was plagued by her drug addiction. In order to support her drug habit, she sold the boys' diapers and clothing. The public assistance check she received for herself and

---

**3.** Dwayne was stabbed five times. The double-edged knife penetrated his heart, right lung and liver. With the same knife, Jerome was stabbed twice in the chest, piercing his heart. There were no other cuts or slashes to the children's clothing other than those corresponding to the wounds nor were there any defensive wounds on the hands, arms or legs of the children.

**4.** Appellant cited *United States v. Bradford*, 344 A.2d 208 (D.C.1975), for the proposition that

either provocation or heat of passion can reduce murder to manslaughter.

**5.** *See Nicholson v. United States*, 368 A.2d 561, 565 (D.C.1977).

**6.** *See Morgan v. United States*, 363 A.2d 999, 1002–03 (D.C.1976), *cert. denied*, 431 U.S. 919, 97 S.Ct. 2187, 53 L.Ed.2d 231 (1977).

for the boys was spent on drugs. She prostituted herself in the room at the Capitol City Inn while the boys were present and left the boys unattended for long periods of time. For many years, Simpson was sole caretaker of his sons. He sought help from a social service agency and cried when he was told nothing could be done. In 1987, the boys and their mother moved to Room 301 of the Capitol City Inn. Simpson quit his last steady job and moved into the shelter's cramped quarters in order to care for his sons.

On the morning of January 4, 1988, Barnes left the room to pick up government checks while Simpson remained with the boys. Barnes did not return that day or night. On the afternoon of January 5, Barnes returned briefly with one check and drugs, then left again promising to return in time to pick up the children's dinner from the shelter cafeteria. As hour after hour passed, Simpson realized that Ms. Barnes was not coming back. Pacing the floor he felt himself losing control. When the children fell asleep, he stabbed them and himself. He lay beside the children's bodies from four to six hours in the hope of bleeding to death before he called security.

The court limited the use of this evidence, refusing to permit appellant to show that this state of mind could operate to reduce second-degree murder to manslaughter. Included in its final instructions to the jury was the standard instruction on second-degree murder, omitting the bracketed language regarding injury to the deceased "in the heat of passion caused by adequate provocation." The court further instructed the jury on manslaughter but gave no instruction on mitigation. In describing the theory of the defense, the trial court refused to instruct that malice could be mitigated by heat of passion.

## I.

### Standard for Jury Instruction on Mitigation

■ "'As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor.'" *Bostick v. United States*, 605 A.2d 916, 917 (D.C.1992) (quoting *Reid v. United States*, 581 A.2d 359, 367 (D.C.1990)). In determining whether a defense instruction was properly denied, this court reviews the evidence in the light most favorable to the defendant, "but not so favorable as to have required the jury to engage in 'bizarre reconstruction[s] of the evidence.'" *Id.* at 917–18 (quoting *Adams v. United States*, 558 A.2d 348, 349 (D.C.1989)).

In this court, appellant argues in effect that in view of the evidence of the harsh circumstances of his existence, the trial court's instruction should have cleared the way for the jury to find that he could have been guilty of manslaughter. Relying on *Brown v. United States*, 584 A.2d 537 (D.C. 1990), and *Comber v. United States*, 584 A.2d 26 (D.C.1990) (en banc), he urges that as a result of the trial court's rulings, "[t]he jury was completely foreclosed from considering the only real issue ... whether 'extreme mental or emotional disturbance for which there is reasonable explanation or excuse' rendered [him] less 'morally blameworthy' than those who kill in the absence of such influences." *Comber, supra,* 584 A.2d at 41 (quoting MODEL PENAL CODE § 210.3 comment 5, at 53, 54 (citations omitted)). He argues that the despair and frustration that he felt (as a result of unemployment, homelessness, two handicapped sons, a long-standing relationship with their mother addicted to drugs) would negate malice and would provoke a reasonable person to suddenly lose control and kill without premeditation, without deliberation and without malice.

We cannot say that appellant's proffered defense of "heat of passion" would have required the jury to engage in a bizarre reconstruction of the evidence. *See Bostick v. United States, supra,* 605 A.2d at 917–18. However, the point of departure here between appellant and the government is a heated dispute about the source of the "provocation" which triggers the passion leading to death. This is understandable in view of the fact that the terms "provocation" and "mitigation" which negate "malice" have evolved over the centuries as legal terms of art when measured as against fixed categories of fac-

tual circumstances. *See generally Brown v. United States, supra,* 584 A.2d at 540, discussing the development of provocation under the common law.

Thus the government, embracing ancient tradition, and distinguishing *Brown, supra,* defines "provocation" as only provocation coming from the deceased victim—suggesting such categories as mutual quarrels, combat, battery, assault and adultery, and argues that provocation does not negate malice where the victim is an innocent third party.[7] On the other hand, the appellant, relying on *Brown, supra,* and the MODEL PENAL CODE, tells us that in the District of Columbia, the law of provocation has developed in the modern vein of confrontation with the facts of each case; "[t]he test of sufficiency of such provocation is that which would cause an ordinary man, a reasonable man, or an average man, to become so aroused [as to kill another]." *Brown v. United States, supra,* 584 A.2d at 542 (citing *Bishop v. United States,* 71 App.D.C. 132, 107 F.2d 297 (1939)).

The *en banc* pronouncements of our court in *Comber v. United States, supra,* do not address the specific issue before us.[8] In view of the dispute over our recognition (or non-recognition) of the MODEL PENAL CODE, we leave that issue for the *en banc* court.

For our purposes, we need not decide here whether the claimed instructional error alone requires reversal because it is apparent that the government's use of, admittedly, illegally obtained evidence to impeach credibility and thus dampen the impact of factually mitigating (and otherwise unchallenged) testimony requires reversal.

## II.

### *Impeachment Testimony and the Sixth Amendment*

#### A.

Appellant contends that the trial court erred by permitting the government to impeach his credibility with a statement obtained in violation of the Sixth Amendment. The government counters that a compelling interest in promoting truth at trial justified impeachment of appellant's credibility with a prior inconsistent statement obtained in violation of the Sixth Amendment.

At a pretrial hearing on appellant's motion to suppress, *inter alia* on *Miranda* and Sixth Amendment grounds, it developed that the statement in question was obtained by one Detective Schwartz who visited Simpson at the Washington Hospital Center (for the third time)[9] on January 12, 1988. On the

7. *Cf. Bostick v. United States, supra,* 605 A.2d at 919, 920 n. 14 (where we held that sufficient evidence of provocation existed to support instruction on mitigation of malice where third party who struck and assaulted defendant with a deadly weapon provoked the defendant who, in the passion of the moment, mistakenly shot a bystander at the scene).

8. In *Comber* (consolidated cases involving factual situations where death ensued as a result of barefisted blows to the faces of victims), we reversed convictions for voluntary manslaughter. Although, in our view, the teachings of *Comber* must be considered in the light of the specific charges, the evidence and the alleged errors, certain basic principles have emerged which are relevant to consideration of the instant case. We know generally, for example, that a mitigation principle is predicated on the legal system's recognition of the weaknesses or infirmity of human nature and that those who kill under extreme mental or emotional disturbance for which there is a reasonable explanation or excuse are less morally blameworthy than those who kill in the absence of such influence. *Id.,* 584 A.2d at 41. We know that manslaughter is distinguished from murder by the absence of malice, and that

implicit in the notion of malice aforethought is the absence of every sort of justification, excuse or mitigation. *Id.* Moreover, we are told that it is the death-oriented mental state that is the dividing line between voluntary manslaughter and involuntary manslaughter. *Id.* at 37. We know that "legally recognized" mitigating factors serve to dampen the otherwise malicious nature of a perpetrator's mental state and that it is the government's obligation to disprove mitigation, and the court's duty to instruct the jury, when there is evidence of such mitigation. We know that "heat of passion" includes "fear, resentment and terror, as well as rage and anger." *Id.* at 41.

9. Detective Schwartz had seen Mr. Simpson in his hospital bed on the morning and afternoon of the day following his operation. Mr. Simpson was treated for his four stab wounds: two chest wounds below his heart and two wounds on both sides of his abdomen. His injuries required that he be treated with a chest tube, two intravenous catheters placed below each clavicle, a nasal-gastric tube, and a Foley catheter placed into his bladder. He also had an oxygen mask placed over his nose and mouth. Detective Schwartz acknowledged that Mr. Simpson was lying in bed

previous day, January 11, 1988, Simpson had been formally indicted, but counsel had been appointed for him at presentment on January 6, 1988. At the time of this third visit, Detective Schwartz knew that Simpson had appointed counsel and knew the lawyer's name. Nevertheless, he decided to "greet" appellant (although he knew that to be improper in the absence of the lawyer). The detective specifically asked Simpson if he wanted to talk about what had happened. The detective knew that any information he obtained could not be used in the government's case in chief, but could be used for impeachment purposes. He did not advise Simpson of his *Miranda* rights, never told him he had been appointed a lawyer, and never asked him for any kind of waiver. The interview lasted for roughly 20 to 30 minutes [10] during which time, according to the detective, appellant said that he waited until

the children had fallen asleep before killing them, that he was careful in stabbing the boys because he only wanted to kill them and did not want to hurt them, that he stabbed Dwayne first because he was the oldest and could have cried out or screamed, and that during the attack on Dwayne, Jerome woke up and mouthed the word "Dad" before appellant stabbed him.

The motions court ruled that appellant's Sixth Amendment right to counsel had attached on January 6, 1988, six days before Detective Schwartz obtained the statements at issue. *See infra* note 12. The court ruled and, the government conceded, that the detective violated Mr. Simpson's Sixth Amendment right to counsel. In response to requests for a finding as to whether the detective acted in bad or good faith, the court answered:

> Q. And you went in there on your own nevertheless?
> A. I did that, yes.
>
>     \*    \*    \*    \*    \*    \*
>
> Q. Were you familiar at that time with what the state of the law was as to whether statements obtained in violation of the 6th Amendment right to counsel could be used as impeachment evidence?
> A. Yes. And I knew that it could not be used in the case in chief.
> Q. And what was your understanding at that time as to whether statements obtained illegally, in violation of the 6th Amendment, could be used as impeachment?
> A. Yes, sir.
> Q. Your understanding was what?
> A. That it could be used for impeachment purposes.
>
>     \*    \*    \*    \*    \*    \*
>
> Q. And again, sir, on January 12, 1988, you never advised Mr. Simpson of any of his Miranda rights, did you?
> A. No, sir, I did not advise him of his rights at all.
> Q. So then you certainly never said, no, Mr. Simpson, I understand that you have a lawyer appointed for you, are you willing to answer any of my questions, did you?
> A. I never told him that, no.
> Q. And you never asked for any kind of waiver from Mr. Simpson?
> A. No, sir, I did not.
>
>     \*    \*    \*    \*    \*    \*
>
> Q. How long did that interview last?
> A. Roughly 20 to 30 minutes. I should say that I'm in the room for about 20 minutes. The interview—his conversation with me probably took approximately 15 minutes.

---

with these tubes and instruments during his interview and that Mr. Simpson was in pain.

During the interview Detective Schwartz asked Mr. Simpson what happened in the hotel room to which the latter shook his head. He interpreted Simpson's reaction as being one of exercising his right not to talk. Another officer had seen Simpson in the Medstar unit upon his arrival. That officer interpreted Simpson's nodding of the head as indication that he understood his rights. The officer did not tell Simpson that he had the right to remain silent or that if he could not afford a lawyer one would be appointed for him.

10. The transcript of the motions hearing reveals the following:

> Q. So you had every expectation that on January 12, 1988, this man [appellant] had had a lawyer appointed to him, didn't you?
> A. I knew he had a lawyer.
> Q. In fact, you knew who the lawyer was, didn't you?
> A. Mr. Delgado.
> Q. And you knew that on January 12, 1988, didn't you?
> A. Yes sir.
>
>     \*    \*    \*    \*    \*    \*
>
> Q. And Detective Schwartz, there was no question in your mind that you had no right to be talking or interrogating Mr. Simpson on January 12, 1988, was there?
> A. In regards to his right to a lawyer?
> Q. You knew that he had a lawyer appointed for him, didn't you, sir?
> A. Yes, sir.
> Q. And you knew that once a lawyer was appointed for someone, you could not talk to that individual without the lawyer's permission, didn't you know that, sir?
> A. Yes, sir.

I will state as follows: I find as a fact that Detective Schwartz did not go to the hospital specifically to conduct a further interrogation of the defendant. I believe that he went there for a legitimate reason to find out when he would be moved from the Washington Hospital Center to a secure custody situation....

However, I do find that once there, Detective Schwartz, knowing that statements he elicited from the defendant could not be utilized in the government's case in chief and knowing that they could be used, or at least thinking that they could be used for impeachment, went in to talk with the defendant.

That is what I know and can state, and I think that's enough for anyone else to conclude whether it was good faith or bad faith. I don't think I have to say that. I'll state what his knowledge was and what he did, knowing that it couldn't be used, and knowing that he could be used in other circumstances, though he might have been right or he might have been wrong.

"On balance" the motions court ruled ultimately that although the statements were obtained in violation of the Sixth Amendment right to counsel, they were voluntary and could be introduced to impeach Simpson's testimony.

At trial, after Simpson had testified on direct examination as to his despair and frustration, the prosecutor's cross-examination sought to establish that Simpson had deliberately and consciously decided to kill his sons.[11]

### B.

The basic question before us is whether the admission, for impeachment purposes at trial, of Simpson's pretrial statements taken in violation of his Sixth Amendment right to counsel, requires reversal. As the parties have briefed this issue, the critical question is whether the violation is a "core" violation, as the appellant claims or merely a violation of a "prophylactic rule," as the government argues. Both parties agree that the Supreme Court in *Michigan v. Harvey*, 494 U.S. 344, 354, 110 S.Ct. 1176, 1182, 108 L.Ed.2d 293 (1990) left open the issue of impeachment use of a statement taken in violation of the "core" Sixth Amendment right to counsel, i.e., "the admissibility for impeachment purposes of a voluntary statement obtained in the absence of a knowing and voluntary waiver of the right to counsel." Appellant's Brief, p. 30; Appellee's Brief, p. 37.

The government nevertheless makes a vigorous argument here, in purported reliance upon *Martinez v. United States*, 566 A.2d 1049, 1059 (D.C.1989), *cert. denied*, 498 U.S. 1030, 111 S.Ct. 685, 112 L.Ed.2d 677 (1991), that the case before us only involves the violation of a prophylactic rule and therefore a compelling interest "in promoting truth at trial" justified the admissibility for impeachment purposes of the pretrial statements taken from Mr. Simpson. Simpson counters that the government's interpretation misconstrues Sixth Amendment jurisprudence. Before turning to *Martinez*, which predated *Harvey*, we will broadly examine such jurisprudence.

For our purposes here the case law (but not the analyses) relied upon for Sixth Amendment jurisprudence may be briefly culled from a reading of both the majority

---

11. The trial transcript reflects the following:

Q. The reason that you decided to kill Jerome and Dwayne was not because of their illness, but because of their mother?
A. You say reason. I was angry and very disappointed at the kids' mother, but I feel that I was very disturbed and out of control, and I killed my two children. But reason? No.
Q. Mr. Simpson, isn't it true that you decided to stab your children just deep enough to kill them, but not to hurt them?
A. You say decided. I say that I suddenly went into a rage and I stabbed my two children.

Q. And, you stabbed them deep enough to kill them, but not to hurt them?
A. I killed them.
Q. And, you took care in stabbing them where you did; isn't that right?
A. Pardon?
Q. And, you took care—you were careful in stabbing them in the exact locations on their chests that you stabbed them?
A. I wouldn't use careful. I went into a rage and I repeatedly stabbed my children. Where, I do not know.

and dissenting opinions in *Michigan v. Harvey, supra,* 494 U.S. 344, 110 S.Ct. 1176. The text of the Amendment provides in pertinent part that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." *Id.* at 348, 356 n. 2, 110 S.Ct. at 1178, 1183 n. 2. A defendant is entitled to the aid of his lawyer from the time of arraignment through the time of first appeal. *See Penson v. Ohio,* 488 U.S. 75, 85, 109 S.Ct. 346, 352, 102 L.Ed.2d 300 (1988); *Powell v. Alabama,* 287 U.S. 45, 68–71, 53 S.Ct. 55, 63–65, 77 L.Ed. 158 (1932). Once formal criminal proceedings begin, the Sixth Amendment renders inadmissible in the prosecution's case in chief, statements "deliberately elicited" from a defendant without an express waiver of the right to counsel. *See generally Maine v. Moulton,* 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985); *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980); *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). For the fruits of post-indictment interrogations to be admissible in a prosecution's case in chief the State must prove a voluntary, knowing and intelligent relinquishment of the Sixth Amendment right to counsel. *Patterson v. Illinois,* 487 U.S. 285, 292–93, 108 S.Ct. 2389, 2394, 101 L.Ed.2d 261 (1988); *Brewer, supra,* 430 U.S. at 404, 97 S.Ct. at 1242.[12]

The *Harvey* majority parts drastically from the *Harvey* minority when it interprets the holding of *Michigan v. Jackson,* 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986) (holding that once a criminal defendant invokes his Sixth Amendment right to counsel, a subsequent waiver of that right—even if voluntary, knowing and intelligent under traditional standards is *presumed* invalid if secured pursuant to police-initiated conversa-

tion) by establishing a prophylactic rule where the prosecution may use a statement taken in violation of that prophylactic rule to impeach a defendant's inconsistent testimony. Drawing upon the reasoning of *Edwards v. Arizona,* 451 U.S. 477, 484, 101 S.Ct. 1880, 1884, 68 L.Ed.2d 378 (1981), which had announced a "prophylactic rule" in the Fifth Amendment context, the *Harvey* majority held that Mr. Harvey (who had signed a constitutional rights waiver form on which he initialed the portions advising him of his right to remain silent, his right to have a lawyer present before and during questioning, and his right to have a lawyer appointed for him prior to any questioning) had no right at trial to use the State's illegally obtained statement to "provide himself with a shield against contradiction of his untruths." *Harvey, supra,* 494 U.S. at 351, 110 S.Ct. at 1180 (citing *inter alia Harris v. New York,* 401 U.S. 222, 224, 91 S.Ct. 643, 644, 28 L.Ed.2d 1 (1971)). Significantly however, the *Harvey* majority, noting that Harvey's counsel did not object to the State's use of his statement for impeachment purposes, remanded the case to the Michigan courts to conduct a hearing to permit the State to meet its burden of proving that Harvey had knowingly and voluntarily waived his right to counsel. *Id.* 494 U.S. at 354, 110 S.Ct. at 1182.[13] Moreover, the majority made it clear that the Court had consistently mandated the exclusion of reliable and probative evidence for *all* purposes when it is derived from involuntary statements, citing *New Jersey v. Portash,* 440 U.S. 450, 459, 99 S.Ct. 1292, 1297, 59 L.Ed.2d 501 (1979), and *Mincey v. Arizona,* 437 U.S. 385, 398, 98 S.Ct. 2408, 2416, 57 L.Ed.2d 290 (1978). *Id.* 494 U.S. at 351, 110 S.Ct. at 1180.

The *Harvey* issue of a right secured after *Miranda* warnings and a later voluntary de-

---

12. While this court stated in *Martinez* that "the 'core purpose' of the [Sixth Amendment] counsel guarantee is to assure aid at trial," *id.* 566 A.2d at 1057 (internal quotations and citations omitted), we nonetheless acknowledged that "the Sixth Amendment right is by no means limited to trial-like proceedings." *Id.* (citing *Michigan v. Jackson, supra,* 475 U.S. at 633, 106 S.Ct. at 1409).

13. The *Harvey* minority, suggesting that the Court had made it clear in *Patterson v. Illinois, supra,* 487 U.S. at 291, 108 S.Ct. at 2393, that the constitutional rule recognized in *Jackson,* was based on the Sixth Amendment interest in preserving "the integrity of an accused's choice to communicate with police only through counsel" drew a distinction between the Fifth and Sixth Amendments and the values each served. 494 U.S. at 355–56, 110 S.Ct. at 1183.

cision to proceed without the assistance of counsel does not place the government in the instant case in a posture where it can rely upon a "search for truth." The government focuses our attention primarily on our own decision in *Martinez v. United States, supra,* 566 A.2d at 1050, decided prior to *Harvey* (and accurately predicting the trend that the Supreme Court would follow), where we held that although the defendant did not waive his Sixth Amendment right to counsel, it was, under the circumstances of that case, not error for the trial court to permit an inconsistent voluntary statement of the defendant to impeach his testimony at trial. *Id.* at 1050. In so doing, we followed the line of cases which equated Sixth Amendment rights with Fourth and Fifth Amendment rights and adopted an approach which balances two competing policies of law—"(1) the policy that proscribes, as a prophylactic measure, the use of evidence obtained in violation of a rule of law, and (2) the policy ... which regards an adversary judicial proceeding as a search for truth." *Id.* at 1055–57. We then applied this approach to the facts in the case of Mr. Martinez. *Id.* at 1057–59.

We do not read our *Martinez* decision as dictating affirmance here. Like the detective in *Martinez,* Detective Schwartz in the instant case initiated and obtained a statement in violation of Simpson's Sixth Amendment right to counsel. Unlike the defendant in *Martinez,*[14] however, Simpson had not been fully advised as to his *Miranda* rights; moreover, unlike the circumstances in *Martinez,*[15] there was evidence that Simpson had a lawyer at the time of his interrogation and his interrogator knew this. It would be safe to say here, even more so than in *Martinez,* that the government did not meet its burden of showing that Simpson (not having been told that he had the right to counsel or that counsel had been appointed for him) had knowingly and voluntarily waived the right to counsel. *See id.* at 1054. Moreover, there is a question in this case as to whether Simpson

spoke voluntarily. Neither this court nor the Supreme Court has made an exception to the exclusionary rule where statements have been made involuntarily as a result of abusive tactics. *See Michigan v. Harvey, supra,* 494 U.S. at 351, 110 S.Ct. at 1180; *Martinez v. United States, supra,* 566 A.2d at 1058–59. Ultimately the issue of voluntariness is one for the appellate court. *See Rogers v. United States,* 483 A.2d 277, 285–86 (D.C.1984), *cert. denied,* 469 U.S. 1227, 105 S.Ct. 1223, 84 L.Ed.2d 363 (1985).

In determining whether Mr. Simpson's statements which he made from a hospital bed were voluntary, we look to the factually similar case of *Mincey v. Arizona, supra,* 437 U.S. 385, 98 S.Ct. 2408. In that case, the defendant was brought to the hospital after being shot. *Id.* at 396, 98 S.Ct. at 2415. Like Mr. Simpson, the defendant had tubes inserted into various parts of his body and was in pain. *Id.* In reversing the Arizona Supreme Court's ruling that his statements were voluntary, the Court reasoned:

> [i]t is hard to imagine a situation less conducive to the exercise of "a rational intellect and a free will" than Mincey's.... [W]hile [the defendant] was being questioned he was lying on his back on a hospital bed, encumbered by tubes, needles, and breathing apparatus. He was, in short, "at the complete mercy" of [the detective], unable to escape or resist the thrust of [the detective's] interrogation.

*Id.* at 398–99, 98 S.Ct. at 2416.

It is apparent from the record that Mr. Simpson was in a weakened state on the three occasions that Detective Schwartz visited him in the hospital. He was in physical pain, isolated from family, friends and legal counsel, and had not been apprised of his right to have counsel present when the interrogation occurred. Unlike the defendants in *Michigan v. Harvey, supra,* 494 U.S. at 346, 110 S.Ct. at 1177, and *Martinez, supra,* 566

---

**14.** *See Martinez v. United States, supra,* 566 A.2d at 1052.

**15.** In *Martinez, supra,* this court stated that "[a]lthough appellant's Sixth Amendment right to an attorney had attached at the time the detectives asked him if he wished to tell his side of the

story, *there is no evidence that he had retained a lawyer or that one had been appointed for him."* *Id.* at 1057–58 (emphasis supplied). We assumed then, for the purposes of the appeal, that appellant was not represented by counsel when he made the statement at issue. *Id.*

A.2d at 1052, the record makes clear that Simpson's statements were given without a waiver, either oral or written. Accordingly, due process of law requires that Simpson's statements, obtained as these were, cannot be used in any manner against him at trial. *Mincey, supra,* 437 U.S. at 402, 98 S.Ct. at 2418.

Finally, therefore, even if we felt called upon (which we do not) to balance the policy of deterring police violations of law as against the policy of a search for truth in this criminal trial, we would not be inclined to elevate the search for truth over that of a constitutional right to counsel (thus putting the prosecution "in a better position than it would have been in if no illegality had transpired," *see Nix v. Williams,* 467 U.S. 431, 443, 104 S.Ct. 2501, 2508, 81 L.Ed.2d 377 (1984)). With some irony here we can be proud of the fact that we are not faced with our "constable [who] has blundered." *See id.* at 455, 104 S.Ct. at 2515 (Stevens, J., concurring in judgment) (internal quotations and citation omitted). We have a detective here who thought he knew the difference between a "core violation" of the Sixth Amendment and the transgression of a "prophylactic rule" which might deter future violations of that Amendment.

In deliberately visiting the hospital room of a physically incapacitated (and crying) Simpson, knowing that Simpson (who had admitted the crime) had been appointed counsel, and initiating a conversation in the absence of counsel, the detective knew that any statements he obtained could not be used in the government's case in chief, but he believed that such statements could be used for impeachment purposes (prompting apparent awe on the part of the motions judge who delegated to "anyone else" the task of concluding whether the elicitation of the statements constituted good faith or bad faith).[16] Under these circumstances, exclusion for all purposes of the statements taken in this

knowing and intentional violation of Sixth Amendment rights is mandated. To permit the balancing of competing interests here would allow the exception to swallow the rule. This we decline to do.

The language of Justice Stevens, concurring in *Nix v. Williams, supra,* 467 U.S. at 455, 104 S.Ct. at 2514, bears yet an additional repetition here:

> More pertinent is what THE CHIEF JUSTICE wrote for the Court on another occasion: "This is not a case where, in Justice Cardozo's words, 'the constable ... blundered,' rather, it is one where the 'constable' planned an impermissible interference with the right to the assistance of counsel." *United States v. Henry,* 447 U.S. 264, 274–275, 100 S.Ct. 2183, 2189, 65 L.Ed.2d 115 (1980) (footnote and citation omitted).

### III.

### *Conclusion*

■ In sum, while we acknowledge that the nature of a perpetrator's state of mind, including his fear, resentment, terror, rage and anger, *Comber v. United States, supra,* 584 A.2d at 41, have been recognized as legally mitigating factors which may dampen the malicious nature of the otherwise death-oriented mental state, we do not decide, here, whether the claimed instructional error requires reversal. Instead, we leave this issue for the *en banc* court. We agree with appellant on the second issue that the government's use of, admittedly, illegally obtained evidence used to impeach his credibility requires reversal. We hold, therefore, that statements taken intentionally from a defendant in the absence of a knowing and voluntary waiver of his right to counsel constitute a "core" violation of the Sixth Amendment and thus must be excluded for all purposes without the balancing of competing interests.

---

**16.** The motions court mused:

> I guess I'm worried here because Detective Schwartz could have been going through the following mental processes and, if not he himself, any other police officer in any other case at any time: "I know I'm not going to be permitted to talk to this defendant. He's got a

> lawyer I'm going to do it anyway, and maybe I can get a confession or admission out of him; and maybe we can't use it, but man, oh man, we'll sure have him locked in if he gets on the stand and starts to lie like a rug. So I'm, going to do it anyway, even though I know it's contrary to the rules, to the Constitution."

The trial court's judgment is accordingly

*Reversed.*

TERRY, Associate Judge, concurring in the result:

I agree that appellant's conviction should be reversed on the ground that the statement obtained by Detective Schwartz from appellant, as he lay in pain in his hospital bed, was involuntary and therefore inadmissible even for impeachment. *See Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). Whether there was a "core violation" of the Sixth Amendment or merely a violation of a "prophylactic rule" is, in my view, somewhat interesting but ultimately irrelevant; voluntariness is the only real issue in this case. For that reason I would not address some of the points discussed in part II of Judge Mack's opinion for the court, and hence I concur only in the result.

With respect to the provocation issue discussed in part I of Judge Mack's opinion, however, I would be inclined to decide it because it is likely to come up again in a retrial. Indeed, I would flatly reject appellant's argument and hold, as the government argues, that the provocation must come from the victim, or at least from someone associated with the victim, as in *Bostick v. United States,* 605 A.2d 916 (D.C.1992). I find no merit whatever in appellant's argument that the harsh circumstances or "personal tragedies" of his daily life could constitute mitigation sufficient to reduce his crime from murder to manslaughter. Our decision in *Brown v. United States,* 584 A.2d 537 (D.C.1990), goes a long way toward enlarging the concept of provocation, but not even *Brown* can be read to support the extreme argument that appellant presents to us here.