Robert V. DAVIS, Appellant,

v.

UNITED STATES, Appellee.

No. 96–CF–275.

District of Columbia Court of Appeals.

Argued April 23, 1997.

Decided Dec. 31, 1998.

Richard K. Gilbert, Washington, DC, appointed by the court, for appellant.

James G. Flood, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Thomas C. Black, and Peter R. Zeidenberg, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, and RUIZ,* Associate Judge, and KERN, Senior Judge.

WAGNER, Chief Judge:

Appellant, Robert V. Davis, was convicted of second degree murder while armed and related weapons offenses in connection with the death of Benjamin Holley.[1] He argues for reversal on the principal ground that the trial court erred in admitting his videotaped confession. Specifically, he contends that his videotaped confession, although given after an informed waiver of his privilege against self-incrimination, was inadmissible because the police deliberately failed to administer *Miranda* warnings in obtaining from him an earlier custodial, incriminating statement.[2] The trial court found that the first statement

---

* Former Associate Judge Ferren was a member of the division that heard oral argument in this case. After his departure from the court, Associate Judge Ruiz was selected by lot to replace him.

1. Davis was indicted for first degree murder while armed (premeditated) (D.C.Code §§ 22–2401, –3203 (1996 Repl.)). He was convicted of the lesser included offense of second degree murder while armed (D.C.Code §§ 22–2403, –3203),

as well as one count of possession of a firearm during a crime of violence or dangerous offense (PFCV) (D.C.Code § 22–3204(b)); carrying a pistol without a license (CPWL) (D.C.Code § 22–3204(a)); and possession of a prohibited weapon (PPW) (machine gun) (D.C.Code § 22–3214(a)).

2. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

was not coerced, but voluntarily given and that Davis voluntarily, knowingly and intelligently waived his *Miranda* rights before making the subsequent statements. In *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), the Supreme Court held that an accused's voluntary post-*Miranda* statement is admissible, notwithstanding that the police obtained from him a pre-*Miranda* statement, provided that the unwarned statement was not coerced. 470 U.S. at 318, 105 S.Ct. 1285. We find no clear error in the trial court's factual findings, and its ruling is consistent with the holding in *Elstad.* Our independent review of the record leads us to conclude, under the totality of the circumstances, that Davis' unwarned statements were voluntary. *See Miller v. Fenton,* 474 U.S. 104, 113, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985). Finding no grounds for reversal based upon Davis' other claims of improper exclusion of evidence and failure to instruct on voluntary manslaughter, we affirm.

## I. *The Suppression Hearing*

### A. *The Evidence*

Benjamin Holley was shot and killed on November 25, 1994, in the 5100 block of Astor Place, S.E., Washington, D.C. According to the evidence at the suppression hearing, Davis was arrested for the crime at about 4:00 p.m. on January 14, 1995, pursuant to an arrest warrant. Davis testified that he was taken to an office at the Police Department between fifteen to thirty minutes after he was stopped. Detective Gregory Sullivan, who had been investigating the case, arrived at the homicide office about 5:00 p.m. Sullivan and his partner, Detective Benjamin Collins, first spoke with Davis there about 5:30 p.m. and informed him he was under arrest for the murder of Benjamin Holley in the 5100 block of Astor Place. The detectives left the room for fifteen to twenty minutes to prepare paperwork, and they observed Davis through a video monitor during that time. Detective Sullivan testified that he knew that Davis had not been given his *Miranda* warnings, but he made the decision

not to read them to him when he returned to the interview room. When the detectives returned to the room around 6:00 p.m., the detectives told Davis that they had learned that he and Angela Daniels (Peanut) shot Holley and that the police had recovered the weapons used. Detective Sullivan told Davis that he could get thirty-five years to life for the offense. About 6:20 p.m., the detectives told Davis that they had spoken to "Peanut," which was not true, and that they "understood that Peanut had the nine millimeter and that Mr. Davis had the AK." Davis blurted out that "Peanut had the AK, I had the nine." Shortly thereafter, Davis asked Detective Sullivan to leave the room, and Sullivan complied. Davis testified that the reason he asked Sullivan to leave the room was because Sullivan seemed aggravated with his answers, and he did not like Sullivan's hostile attitude, although Sullivan said nothing.

After Detective Sullivan left the room, Detective Collins interviewed Davis until about 6:45 p.m., and Detective Sullivan observed them on the video monitor. Davis told Detective Collins that he had shot Holley with the nine millimeter weapon and that Daniels shot Holley with the AK–47. At one point, Davis said that he knew that this day was coming. Sometime after admitting his involvement in the murder, Davis mentioned that he had a sister who was a police officer. Collins said that he knew her and had a "pretty close working relationship" with her. After Davis made the inculpatory admissions, Detective Collins told him that this day would change his life and that he should "stand up and be a man and accept whatever comes down the road."

About twenty-five minutes later, at about 7:00 p.m., Detective Collins advised Davis of his *Miranda* rights, and Davis signed a PD–47 rights card indicating that he wanted to waive his rights. Davis gave a videotaped statement at 7:11 p.m. At the beginning of the videotape, Davis confirmed the rights that Detective Collins had read to him. Davis also acknowledged that he had waived these rights in writing on the back of the rights card where he signed his signature.[3]

---

**3.** Davis acknowledged that the detective had read him the following from the PD–47 warning

of rights card:

Davis then gave substantially the same statements that he had made previously. After the taped statement, Davis telephoned his sister and told her that he shot someone.[4] The videotape of the statement was played for the court during the suppression hearing.[5]

During the time that Davis was in the interview room, he was seated in a chair with his left arm handcuffed to a bolt which was affixed to the floor. Sullivan testified that they made no threats or promises to Davis and that Davis was not reluctant to talk. Sullivan said that they did not become angry at Davis, express disgust or engage in any different role playing (*e.g.*, good cop/bad cop) for purposes of the interrogation. The detectives did not take their weapons into the interview room. Detective Sullivan said that Davis requested cigarettes and a drink before 6:30 p.m., and they provided both. Sullivan also testified that Davis did not appear to be uncomfortable or under the influence of drugs or other intoxicants during the interview.

Davis testified that he was eighteen years old at the time of his arrest in this case and went to the tenth grade, although he did not complete the grade. He acknowledged arrests while a juvenile for unauthorized use of a motor vehicle and simple assault and a traffic arrest four days before his arrest in this case. However, Davis could not recall whether he had ever been advised of his *Miranda* rights. Consistent with the detectives' testimony, Davis admitted that the detectives did not threaten him or make him any promises. He also testified that he did not believe the detectives had spoken to Peanut, as they said, because the detective showed him a paper purporting to show that Peanut had been locked up three days earlier, and Davis had seen Peanut just two days ago. Davis stated that he thought that he had telephoned his sister before he filled out the rights card. He admitted that he told her that he had been arrested for murder and that "there is no use in not talking, I already talked to him and I did it."

### B. *The Trial Court's Ruling*

The trial court found that Davis' pre-*Miranda* statement was made voluntarily and without coercion and that Davis' second statement was preceded by full *Miranda* warnings of rights, which Davis knowingly, voluntarily and intelligently waived. In reaching the voluntariness determination, the trial court considered the totality of the circumstances. Specifically, the court took into account: (1) Davis' age, prior arrests, and the absence of any police promises, threats, mistreatment or the display of weapons; (2) that Davis was not under the influence of drugs or alcohol, confused or upset; (3) that he answered questions directly and appeared to understand what was transpiring;[6] (4) that while uncomfortable, Davis appeared to be in no pain, and handcuffing was routine procedure in a murder case; and (5) that the detectives' falsehood about the gun was designed to elicit a truthful statement, not an untruthful one. Assuming, without deciding, that Detective Sullivan was annoyed by Davis' responses and told him that they would be there all day, the trial court found "that this had very little impact upon [Davis']

---

You are under arrest. Before I ask you any questions you must understand what your rights are. You have the right to remain silent. You are not required to say anything to us at any time or to answer any questions. Anything you say can be used against you in court.

You have a right to talk to a lawyer for advice before any questions ... before I question you, and to have him with you during questioning.

If you cannot afford a lawyer and want one, a lawyer will be provided for you. If you want to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

4. At the suppression hearing, Detective Sullivan recounted Davis' conversation with his sister as follows:

He told her he was under arrest and said he— it was for murder and then he said, I did it, Gina, I shot somebody. I did it. I pulled the trigger, but I didn't kill him.

5. A transcript was provided, but it was not admitted into evidence.

6. The trial court viewed the videotaped statement.

decision to provide information to the police." The court found that the circumstances showed that Davis was not compelled to talk, and it appeared, therefore, that he had acted out of moral compulsion. Having found the pre-*Miranda* statement to be voluntary, the court determined that the post-*Miranda* videotaped statement was admissible under *Elstad, supra.* The court also found that Davis made the statement to his sister after *Miranda* warnings, and therefore, ruled it admissible.

## II. *Analysis*

Davis argues that the trial court erred in ruling that the post-*Miranda* videotaped statement was admissible under *Elstad, supra.* He advances two reasons for the trial court's error, specifically that: (1) contrary to the court's findings, the statement was not voluntary; and (2) *Elstad* is inapplicable where the police deliberately decide to forego *Miranda* warnings until after interrogation which results in a confession.

■■■ In *Elstad, supra,* the Supreme Court held that the accused's pre-*Miranda* statement does not necessarily render inadmissible a subsequent statement made after *Miranda* warnings. *Elstad,* 470 U.S. at 314, 105 S.Ct. 1285; *Cowan v. United States,* 547 A.2d 1011, 1015 (D.C.1988). Where the police question a suspect without administering the required *Miranda* warnings of rights, there is a presumption of compulsion, rendering the statement excludable from evidence in the government's case in chief, even if otherwise voluntary in the context of the Fifth Amendment. *Elstad,* 470 U.S. at 307, 105 S.Ct. 1285. "Despite the fact that patently *voluntary* statements taken in violation of *Miranda* must be excluded from the prosecution's case, the presumption of coercion does not bar their use for impeachment purposes on cross-examination." *Id.* (citing *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971)).

■■■ Under *Elstad, supra,* a voluntary statement given after *Miranda* warnings is admissible even if the accused has given a prior unwarned statement, provided such prior statement was not coerced. 470 U.S. at 318, 105 S.Ct. 1285; *United States v. Gale,* 293 U.S.App.D.C. 218, 223, 952 F.2d 1412, 1417 (1992). The focus of the admissibility determination is whether the second statement was in fact voluntary. *Elstad,* 470 U.S. at 318, 105 S.Ct. 1285. The Supreme Court explained further that

[i]t is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made

*Id.* at 309, 105 S.Ct. 1285.

### A. *Voluntariness*

Davis argues that the totality of the circumstances, including particularly the manipulative tactics of the police and their deliberate failure to apprise him of his *Miranda* rights, demonstrate that his statements were involuntary. It is also Davis' position that the police questioning should be viewed as one continuous interrogation, although he claims that the coercion occurred before, rather than after, the *Miranda* warnings. Put another way, Davis does not contend that "*additional* coercion occurred during the waiver of the *Miranda* rights or during the videotaped statement."

■■■ The burden is on the government to prove that the statements of the accused were voluntarily given without police coercion. *Martin v. United States,* 567 A.2d 896, 907 (D.C.1989) (citing *Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972)) (other citation omitted). Setting aside for a moment Davis' contention that there was a single interrogation, a review of the record supports the trial court's determination that Davis' initial statement was voluntary and not the result of threats, promises or coercion. *See Elstad, supra,* 470 U.S. at 305, 105

S.Ct. 1285. Generally, the factors for consideration in determining voluntariness include the circumstances surrounding the questioning, the accused's age, education, and prior experiences with the law, his physical and mental condition at the time the statement was made, other factors showing coercion or trickery, and the delay between the suspect's arrest and the confession. *Beasley v. United States,* 512 A.2d 1007, 1013 (D.C.1986), *cert. denied,* 482 U.S. 907, 107 S.Ct. 2485, 96 L.Ed.2d 377 (1987) (citations omitted). On appeal, deference must be given to the trial court's findings of fact, however, review of the trial court's legal conclusions is *de novo. Hicks v. United States,* 705 A.2d 636, 639 (D.C.1997) (citations omitted); *Byrd v. United States,* 618 A.2d 596, 599 (D.C.1992) (whether appellant's confession was voluntary is a question of law that requires independent appellate review) (citing *Miller v. Fenton, supra,* 474 U.S. at 106, 106 S.Ct. 445).

In this case, the trial court considered all of these factors and made factual findings, based on evidence in the record, which support its conclusion that the initial inculpatory statement was uncoerced and voluntary. Davis, an eighteen year old with an education to the tenth grade, had been arrested on three prior occasions; he was not under the influence of alcohol or drugs and in no pain or unusual discomfort under the circumstances. The court found that the detectives did not engage in coercive tactics or conduct which overbore Davis' free will. *See Rogers v. Richmond,* 365 U.S. 534, 544, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961). Specifically, they made no threats or promises and complied with his request for Sullivan to leave the room, for cigarettes and a drink, and later to make a telephone call. The testimony of the detectives supports the trial court's findings in this regard.

Davis contends that the detectives' use of psychologically manipulative tactics, along with their failure to apprise him of his rights initially, among other factors, resulted in an involuntary statement. He points out

that the detective told him a deliberate falsehood about his role in the offense, specifically, that Peanut had informed the detectives that Davis had the AK–47. "Confessions generally are not vitiated when they are obtained by deception or trickery, as long as the means employed are not calculated to produce an untrue statement." *In re D.A.S.,* 391 A.2d 255, 258 (D.C.1978); *accord, Beasley, supra,* 512 A.2d at 1015–16. The trial court found specifically, and we agree, that this particular statement was directed toward eliciting a true statement, not a false one. Moreover, Davis testified that he did not believe the detectives' account about Peanut because it was inconsistent with Davis' own first-hand knowledge about Peanut's whereabouts. Under the circumstances, the deception employed by the detectives was insufficient to render the trial court's finding of voluntariness erroneous.

Davis places great reliance on a statement which he attributes to Sullivan to the effect that they would be there all day if he did not cooperate. Sullivan denied making any such statement. The trial court did not resolve this conflict in the testimony, but assuming *arguendo* that Davis was correct on this point, the court determined, taking into account Davis' demeanor, that this statement did not impress Davis or impact on his decision to provide a statement. Davis' actions toward Sullivan, whom he asked to leave the room at one point, lends support to this conclusion.

**B.** *Applicability of Elstad*

Davis argues that *Elstad* does not apply in this case because the police intentionally failed to advise him of his *Miranda* rights before the initial confession. Conceding that this factor standing alone is not dispositive, Davis contends that where combined with the fact that his confession was obtained during extended, custodial interrogation, *Miranda's* exclusionary rule should apply. Citing Justice Stevens' dissenting opinion in *Elstad,* he contends that the case implies that there are some circumstances which a subsequent waiver of *Miranda* will not cure .[7]

---

7. Davis refers to the following statement from Justice Stevens' dissenting opinion:

> I am persuaded that the Court intends its holding to apply only to a narrow category

Davis relies primarily on the Eighth Circuit's opinion in *United States v. Carter*, 884 F.2d 368 (8th Cir.1989). In *Carter*, the court upheld the suppression of the defendant's post-*Miranda* confession where it came "almost directly on the heels of the first [unwarned confession]." *Id.* at 373. Postal inspectors interrogated Carter for approximately fifty-five minutes about the disappearance of Canadian money, and with Carter's consent, searched his wallet and found marked money and a check which the inspectors had placed in a mail tray. 884 F.2d at 369. The inspectors confronted Carter with these circumstances, and he in turn made incriminating statements. *Id.* Only then did the inspectors advise Carter of his rights under *Miranda* before he provided a written statement confessing his guilt. *Id.* In upholding the trial court's suppression order, the court concluded that the oral and written confessions were a part of one continuous process and that the *Elstad* rule did not permit "this sort of end run around *Miranda.*" *Id.* at 373.

■ Davis contends that, like Carter, he was subjected to one continuous period of custodial interrogation during which he was not informed of his rights until he had confessed to the crime. Here, both detectives left Davis alone for a fifteen minute period after his initial statement before administering *Miranda* warnings, and his videotaped statement was made another eleven minutes thereafter. Thus, unlike *Carter, supra*, some twenty-six minutes elapsed between the end of Davis' initial statement and the subsequent one.[8] In *Elstad, supra*, the time separation between the initial unwarned statement and the subsequent one given after *Miranda* warnings was approximately one hour. The *Elstad* holding did not turn on the time frame between the two confessions. Rather, *Elstad* seems to eschew rigid rules

based upon such a factor. In that regard, the Supreme Court stated:

A handful of courts have, however, applied our precedents relating to confessions obtained under coercive circumstances to situations involving wholly voluntary admissions, requiring a passage of time or break in events before a second, fully warned statement can be deemed voluntary. *Far from establishing a rigid rule, we direct courts to avoid one; there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of Miranda, was voluntary* . The relevant inquiry is whether, in fact, the second statement was also voluntarily made. As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements. The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative.

*Elstad*, 470 U.S. at 317–18, 105 S.Ct. 1285 (footnote omitted) (emphasis added). Thus, we are not persuaded by *Carter, supra*, to hold, particularly on the facts of this case, that what occurred here was one continuous interrogation requiring suppression of the statement obtained after *Miranda* warnings.[9] Further, the Supreme Court has stated that in circumstances involving the admissibility of a properly warned confession which follows an unwarned, but clearly voluntary admission, a break between the two is not essential. *Id.* at 310, 105 S.Ct. 1285.

In these circumstances, a careful and thorough administration of *Miranda* warnings serves to cure the condition that rendered the unwarned statement inadmissible. The warning conveys the relevant information and thereafter the suspect's choice

of cases in which the initial questioning of the suspect was made in a totally uncoercive setting and in which the first confession obviously had no influence on the second.
*Elstad, supra*, 470 U.S. at 364, 105 S.Ct. 1285.

8. The time between the commencement of Davis' initial statement and the warned confession was forty-one minutes (from 6:20 p.m. until 7:11 p.m.).

9. Davis also cites in support of his argument *Gale, supra*, 293 U.S.App.D.C. 218, 952 F.2d 1412 for the proposition that *Elstad* did not apply where the police deliberately tried to "end run" around *Miranda*. However, it is not clear that the court in *Gale* approved the holding in *Carter*, since its facts were distinguishable.

whether to exercise his privilege to remain silent should ordinarily be viewed as an "act of free will."

*Elstad,* 470 U.S. at 310–11, 105 S.Ct. 1285 (citing *Wong Sun v. United States,* 371 U.S. 471, 486, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)).

 While the police officer's intentional decision to forego *Miranda* warnings may be a factor in the totality of the circumstances to be considered by the court in assessing the voluntariness of the confessions, it is not the sole factor. *See Bliss v. United States,* 445 A.2d 625, 631 (D.C.1982), *cert. denied,* 459 U.S. 1117, 103 S.Ct. 756, 74 L.Ed.2d 972 (1983). Voluntariness depends on the surrounding circumstances, including whether there were "police tactics or methods offensive to due process that render the initial admission involuntary and undermine the suspect's will to invoke his rights once they are read to him." *Elstad, supra,* 470 U.S. at 317, 105 S.Ct. 1285. Here, the trial court considered the totality of the circumstances and applied *Elstad* properly to the facts as found from the evidence. Upon review of the record, we are satisfied that Davis' pre-*Miranda* statements were voluntary. Therefore, we find no error in the denial of the motion to suppress.

We do not condone, however, the deliberate failure of the police to inform a criminal suspect promptly of his rights under *Miranda.* In addition to the obvious impropriety of such conduct, it proceeds at some risk to the legitimate interests of the government and the citizens it serves. There is no guarantee that the suspect will provide the second confession once the warnings are given, and the failure to warn may, in some cases, be the factor which tips the scales in favor of exclusion of the confession.

### III. *Mitigation Defense*

 We need address only briefly Davis' remaining claims of error. First, he argues that the trial court erred in denying a jury instruction on the lesser-included offense of voluntary manslaughter.[10] He also contends that the trial court erred in striking the testimony of defense witness Shawn James concerning decedent's prior bad acts and convictions. Davis concedes that self-defense was not raised by the evidence, but he contends that the stricken evidence was relevant to the issue of provocation generated by his fear of the decedent and that such evidence of mitigation could negate the element of malice in second degree murder, thereby reducing it to manslaughter.

 The trial court rejected the claim of provocation, considering that the evidence showed that "decedent asked for a gun which no one gave him and that he then left and [Davis] went after him and … sought him out and shot him in the back." There was evidence that the decedent left and went toward his apartment when he was asked to leave and that Davis said that he should kill him. Davis then left with a companion and shot the victim, and returned to the group and reported what he had done. The court asked if there was any other evidence to support Davis' position. He offered only that the decedent had stabbed him three and a half years earlier and that James would have testified that the decedent attacked him (James) in a Metro station at some unspecified time in retaliation for James having assisted Davis. There was no evidence of provocation by decedent at or near the time of the shooting in this case.

 "If requested, the trial court must give a lesser included offense instruction whenever there is evidence to support it, no matter how weak." *Price, supra,* 602 A.2d at 644 (citations omitted). In order to reduce murder to manslaughter, a showing of "heat of passion" is required, and it must derive from sufficient provocation that it " 'would cause an ordinary reasonable person to lose his or her self control and act without reflection[.]' " *Id.* at 645 (quoting *Brown v. United States,* 584 A.2d 537, 543 (D.C.1990)). Such evidence is not present here. *Id.* Therefore, the trial court properly denied the requested instruction. Davis agreed that the

---

10. The two prerequisites for granting a lesser-included offense instruction are that: (1) the lesser offense must consist of some, but not every element of the greater offense; and (2) the evidence must be sufficient to support the lesser charge. *Price v. United States,* 602 A.2d 641, 644 (D.C.1992).

excluded evidence went only to the reasonableness of his fear of the decedent, and therefore, if he was not entitled to an instruction on provocation or mitigation, the excluded evidence would be irrelevant. Accordingly, we do not address the claim further.

For the foregoing reasons, the judgment of convictions appealed from hereby is

*Affirmed.*

RUIZ, Associate Judge, dissenting:

The majority's opinion seriously undermines the *Miranda* requirement that a suspect in custody must be informed of important constitutional rights and be given an opportunity to waive those rights before being interrogated. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The majority opinion goes astray, I believe, because it follows the disposition in *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), without considering significant qualifications made by the court in *Elstad* concerning the degree of police misconduct in failing to give the required *Miranda* warnings as well as the effect, *in fact,* of the first unwarned confession on the later warned one. Although deference to the trial court is appropriate with respect to certain underlying historical facts, "the ultimate issue of 'voluntariness' is a legal question" that we determine *de novo, Miller v. Fenton,* 474 U.S. 104, 110, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985), taking into consideration a "complex of values [that] militates against treating the question as one of simple historical fact." *Id.* at 116, 106 S.Ct. 445 (internal quotation omitted). With these considerations in mind, I conclude that Davis' videotaped confession was involuntary in the constitutional sense because the underlying facts in this case were much more egregious than those in *Elstad* and warrant suppression of Davis' videotaped confession even though it was given after the police finally gave Davis the required *Miranda* warnings. Thus, I respectfully dissent.

The holding in *Elstad* was succinctly put by the Court:

We hold today that a suspect who has once responded to unwarned yet uncoercive questioning is not *thereby disabled* from waiving his rights and confessing after he has been given the requisite *Miranda* warnings.

*Id.* at 318, 105 S.Ct. 1285 (emphasis added). What this means is simply that the unrebuttable legal presumption that an unwarned confession is the result of coercive police conduct, and therefore inadmissible in the government's case in chief, *id.* at 317, 105 S.Ct. 1285, does not apply to also render inadmissible, as a matter of law, a second, warned confession. *Elstad* does not, however, reverse the presumption to favor admissibility of the second confession, and the government still bears the burden of proving, by a preponderance of the evidence, that the second confession was voluntarily given. *See Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); *Martin v. United States,* 567 A.2d 896, 907 (D.C.1989), *cert. denied,* 506 U.S. 1011, 113 S.Ct. 632, 121 L.Ed.2d 563 (1992). The fact that the second confession came after *Miranda* warnings does not, *ipso facto,* render it admissible. Rather, the preceding *Miranda* warning is a highly probative fact that goes to the voluntariness of the subsequent confession sought to be admitted. It is a factor to be considered among the totality of the circumstances in determining whether there was a knowing and voluntary waiver of rights which, in turn, reflects on the voluntariness—and corresponding admissibility—of the subsequent statement. *See Elstad, supra,* 470 U.S. at 318, 105 S.Ct. 1285; *Cowan v. United States,* 547 A.2d 1011, 1015 (D.C.1988) (citing *Elstad,* 470 U.S. at 314, 105 S.Ct. 1285).

The Supreme Court's holding in *Elstad* that the presumption that an unwarned confession is coerced does not apply to a subsequent, warned confession was not intended to liberate law enforcement officers from their legal obligation promptly to "Mirandize" a suspect once in official custody:

The Court today in no way retreats from the bright-line rule of *Miranda.* We do not imply that good faith excuses a failure to administer *Miranda* warnings; nor do we condone inherently coercive police tactics or methods offensive to due process that render the initial admission involuntary and undermine the suspect's will to

invoke his rights once they are read to him.

*Id.* at 317, 105 S.Ct. 1285; *see id.* at 346, 105 S.Ct. 1285 (Brennan, J., dissenting) ("[I]f the official violation of *Miranda* was flagrant, courts may fairly conclude that the violation was calculated and employed precisely so as to 'undermine the suspect's ability to exercise his free will.'") (citing majority opinion at 309, 105 S.Ct. 1285); *id.* at 364, 105 S.Ct. 1285 (Stevens, J., dissenting) ("I am persuaded that the Court intends its holding to apply only to a narrow category of cases in which the initial questioning of the suspect was made in a totally uncoercive setting and in which the first confession obviously had no influence on the second.").

Because of the central importance of *Miranda* warnings to the issue of voluntariness, the Court in *Elstad* took pains to show that the police officers in that case acted reasonably and did not purposely disregard their obligations nor the suspect's rights. First, the Court noted that one officer's failure to give *Miranda* warnings "may have been the result of confusion as to whether the brief exchange qualified as 'custodial interrogation' or it may simply have reflected [the police officer's] reluctance to initiate an alarming police procedure .... Whatever the reasons for [the police officer's] *oversight*, the incident had *none* of the earmarks of coercion." *Id.* at 315–16, 105 S.Ct. 1285 (emphasis added).

It is not possible to excuse or explain the police conduct in this case with similar niceties. At Davis' suppression hearing, Detective Sullivan testified that he had been the officer who obtained a warrant for Davis' arrest and that the warrant had been executed and Davis had been arrested at 4:00 p.m. on January 14, 1995. Thus, there is no question that the police here knew that Davis was in custody and that *Miranda* warnings were therefore required. Not only was the police officer in this case not confused about the need to give warnings—as the Court ventured may have been the case in *Elstad*—but Detective Sullivan also admitted, and gave no explanation for, having made a *conscious decision*, when active interrogation of Davis began almost two hours after the arrest, *not*

*to give Miranda warnings,* as constitutionally mandated. *Miranda* warnings were not given to Davis until one hour into active police interrogation (three hours after arrest) and only *after* Davis had confessed to murder.

Nor can we possibly derive confidence in the voluntariness of Davis' waiver of his rights—once they were tardily given—from the fact that, as in *Elstad,* "[n]either the environment nor the manner of either 'interrogation' was coercive." *Id.* at 315, 105 S.Ct. 1285. In *Elstad,* the court noted that "[t]he initial conversation took place at midday, in the living room area of respondent's own home, with his mother in the kitchen area, a few steps away" and that "the brief stop" at the home had not been for the purpose of interrogating the suspect, "but to notify his mother of the reason for his arrest." *Id.* By contrast, here, Davis was arrested, taken to the police station, and two hours later subjected to active police interrogation for at least forty-five minutes—hardly a "brief stop." During this time he was in an interrogation room handcuffed by one arm to a bolt in the floor—quite unlike being in the familiar surroundings of his own living room at home as in *Elstad.*

Under these circumstances, the fact that the officers finally apprised Davis of his rights three hours after being taken into custody, after active interrogation had yielded a confession to murder, a mere ten or fifteen minutes before concluding the interrogation session by videotaping the confession is insufficient, under *Elstad,* to render the videotaped confession admissible. That the officers' unconscionable delay in advising Davis of his rights undermined his will is evident from Davis' statement, made during a telephone call with his sister (a police officer) which the trial court found occurred after he had confessed and *Miranda* warnings were subsequently given, that "there is no use in not talking, I already talked to him and I did it." Although a *suspect's ignorance* of the consequences of an unwarned confession does not compromise the voluntariness of an admission of guilt, *see Elstad, supra,* 470 U.S. at 317, 105 S.Ct. 1285, the

fact that the *police are aware of and exploit* [1] the suspect's serious misunderstanding of his legal rights compounds the egregiousness of the police's behavior in this case, making it further distinguishable from *Elstad. Id.* at 316, 105 S.Ct. 1285 ("Nor did the officers exploit the unwarned admission to pressure respondent into waiving his right to remain silent.")

As the Court of Appeals for the Eighth Circuit has explained, "*Elstad* did not go so far as to fashion a rule permitting this sort of end run around *Miranda*." *United States v. Carter,* 884 F.2d 368, 373 (8th Cir.1989). Distinguishing the possibly inadvertent *Miranda* violation in *Elstad* from the more certain custody situation requiring warnings in the case before it, the *Carter* court observed that *Elstad* "gave no indication that it intended to give a green light to law enforcement officers to ignore the requirements of *Miranda* until *after* such time as they are able to secure a confession." *Id.* The court also distinguished *Elstad* by noting that there an hour had passed between the first unwarned confession at the suspect's home and the subsequent warned confession at the police station. In *Carter,* "there was no passage of time to speak of between the unwarned confession and the subsequent warnings and confession, all of which occurred as part and parcel of a continuous process." *Id.* at 373.

Federal and state appellate courts have cited *Carter, supra,* with apparent approval of the proposition that *Elstad* should not be interpreted as automatically permitting the admissibility of a second confession, even if voluntary, without first evaluating the egregiousness of the police's conduct in failing to administer required *Miranda* warnings and the existence of a clear break between the first, unwarned and the second, warned confession. *See United States v. McCurdy,* 40 F.3d 1111, 1117 (10th Cir.1994) (distinguishing *Carter* on the ground that officers did not coerce suspect into making incriminating statements and that there was "a delay of several hours between the time that the officers detained [suspect] in their custody and

the time that he was formally arrested, Mirandized and gave his statement"); *United States v. Gale,* 293 U.S.App.D.C. 218, 224, 952 F.2d 1412, 1418 (1992) (noting that, unlike in *Carter,* there was "no evidence . . . of a deliberate 'end run' around *Miranda* and, consequently, no error in the district court's refusal to suppress" the warned incriminating statement); *Halberg v. State,* 903 P.2d 1090, 1098, 1099 n. 3 (Alaska Ct.App.1995) (distinguishing facts from *Carter,* noting that police's violation of *Miranda* was "not flagrant or purposeful," "that the police tried to comply with the duty [imposed by] *Miranda*" and that "[t]here was a significant interval—approximately seven hours—between" the first unwarned interrogation and the second warned one); *see also State v. Nobles,* 122 Idaho 509, 835 P.2d 1320, 1324 (Idaho Ct.App.1991), *aff'd,* 122 Idaho 470, 835 P.2d 1281 (1992) (concluding, after first determining that both unwarned and warned incriminating statements were voluntary, "[n]or is there any evidence to suggest that the officers exploited the unwarned admission to pressure [the suspect] into waiving his right to remain silent in confessing" the second time, after warnings were given).

This case is more like *Carter* than *Elstad.* As in *Carter,* Davis' videotaped confession was but the conclusion of a continuous interrogation. The number of minutes between unwarned and warned confessions is not, by itself, determinative. It is relevant in evaluating whether there was an opportunity to reconsider between the unwarned and the warned confessions sufficient to dissipate the taint of the unwarned confession. Here there was a ten-to-fifteen minute break during which Davis was left alone after he confessed the first time. This was merely the time it took the officers to set up the videotaping equipment. During that time, Davis continued to be in the same place, handcuffed to the floor, knowing that the officers were preparing for the final videotaping, which commenced some ten minutes later. The fact that Davis was alone during this brief period is negligible under the circumstances. Had *Miranda* warnings been given and then

---

1. Detective Sullivan testified at the suppression hearing that he was present when Davis spoke to his sister on the telephone.

Davis had been left alone, it might be possible to consider this short interval as a period during which the interrogation stopped and Davis had some time to reflect and reconsider his statements in light of his rights. Instead, the officers here did not advise Davis of his rights until after they returned to begin to videotape his confession. *Cf. United States v.. Gale, supra,* 293 U.S.App.D.C. at 223 n. 9, 952 F.2d at 1417 n. 9 ("[A] change in location and the passage of time between coerced statements and a post-*Miranda* statement are viewed as relevant to show that any coercion has dissipated to the point that a defendant is able to make a rational decision to waive his rights at a later time.") (citing *Elstad, supra,* 470 U.S. at 310, 105 S.Ct. 1285); *see also Stewart v. United States,* 668 A.2d 857, 867 (D.C.1995).

Most recently, the Court of Appeals for the First Circuit affirmed the trial court's suppression of incriminating statements made in open court, even though voluntary, that were the fruit of prior unwarned statements. *See United States v. Byram,* 145 F.3d 405 (1st Cir.1998). The court stated that the, police had acted in "good faith"—albeit objectively incorrectly—when the officer failed to give *Miranda* warnings the first time that the witness made incriminating statements; and that the witness was not entitled to *Miranda* warnings before his trial testimony when he made a second incriminating statement, because he was not then in a custodial setting.[2] Nonetheless, the court of appeals held that the witness' second statement at the state trial was properly excluded when that witness then became a defendant in a federal prosecution, as the tainted fruit of the unwarned incriminating statements that had been made by the witness while in custody a month earlier. In reaching its conclusion that the state trial testimony should be suppressed, the court looked at the specific facts linking the first, unwarned statements with the second incriminating statements made at trial; it did not terminate its inquiry, as the majority does in this case, once it determined that both incriminating statements were voluntary. In support of its approach, the court opined as follows:

> Our own view, highly tentative in the absence of more guidance from the Supreme Court, is that *Elstad* would be hard to confine to technical violations [of *Miranda* ]; its language emphasizing the voluntariness test as the prime safeguard is too powerful for that. But by the same token we think that *Elstad* does not wholly bar the door to excluding evidence derived from a *Miranda* violation—at least where the *Miranda* violation is not merely technical, where there is a substantial nexus between the violation and the second statement, and where the second statement is not itself preceded by an adequate *Miranda* warning.
>
> . . . .
>
> ... All members of the panel agree that the events in this case are unusual and that *Elstad* discourages any promiscuous use of the fruits doctrine in ordinary *Miranda* cases.

*Id.* at 409–10 (footnote omitted).

Although the facts of this case are different from those in *Byram,* particularly in that Davis did receive some measure of *Miranda* warnings immediately before he confessed on the videotape,[3] the police conduct here was much more egregious than in *Byram,* where the police were found to have acted in good faith and a *month* had elapsed between the first inadmissible confession and the later one sought to suppressed. What *Carter, Byram* and the other cases citing *Carter* with approval make clear is that the Supreme Court's opinion in *Elstad* is not as straightforward as the majority would have it. It is not sufficient, in short, for this court to conclude only that because the first and second confessions were voluntary in fact, the second one, if warned, is therefore automatically admissible. The totality of the circumstances must be considered.

The facts in this case are that the police violated *Miranda* deliberately and that there

---

**2.** Neither the trial judge nor counsel followed the salutary practice of advising the witness of the privilege against self-incrimination.

**3.** For the reasons that I have stated earlier, *see supra* at 1172, the manner and timing of the

*Miranda* warnings that Davis finally received in this case give no assurance of their efficacy.

was scant opportunity for the belated warnings to do much good. The Supreme Court recognized in *Miller*, which was decided after *Elstad*, that because "ours is an accusatorial and not an inquisitorial system, ... tactics for eliciting inculpatory statements must fall within the broad constitutional boundaries imposed by the Fourteenth Amendment guarantee of fundamental fairness." 474 U.S. at 110, 106 S.Ct. 445 (internal citation omitted). Thus, in addition to testing confessions against the Fifth Amendment privilege against self-incrimination, "the Court has continued to measure confessions against the requirement of due process." *Id.* That is "significant because it reflects the Court's consistently held view that the admissibility of a confession turns as much on whether the techniques for extracting the statements, as applied to *this* suspect, are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means as on whether the defendant's will was in fact overborne." *Id.* at 116, 106 S.Ct. 445 (citing *Gallegos v. Colorado*, 370 U.S. 49, 51, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962)). Therefore, not only does *Elstad* not preclude suppression in the circumstances of this case, but when the confession at issue here is viewed against the broader due process considerations in *Miller*, thoughtful application of the exclusionary rule mandates that it be suppressed.

The Supreme Court's more recent jurisprudence on the exclusionary rule in the context of the Fourth Amendment is instructive on the question whether, in this Fifth Amendment context, an unwarned confession should be excluded. In *Arizona v. Evans*, 514 U.S. 1, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995), the Court refused to exclude evidence that was obtained as a result of a seizure and search in violation of the Fourth Amendment. The Court distinguished between a Fourth Amendment violation, the search and seizure, and the use of the fruits of a search in violation of the Fourth Amendment. *Id.* at 10, 115 S.Ct. 1185. Noting that the exclusionary rule which suppresses the fruit is a "remedial device [to deter police misconduct], the rule's application has been restricted to those instances where its remedial objectives are thought most efficaciously served." *Id.*

at 11, 115 S.Ct. 1185. As the police had acted to arrest in reasonable reliance on court-supplied information, the evidence seized as a result of the unlawful arrest was deemed admissible because exclusion would not likely affect future police conduct.

Similar considerations apply in the Fifth Amendment context. In *Elstad*, the Court distinguished between coercive police conduct that leads to confessions involuntary in fact, and police failure to give required warnings which results in confessions presumed to be involuntary as a matter of law. The latter, the Court explained in *Elstad*, is "preventive medicine [that] provides a remedy even to the defendant who has suffered no identifiable constitutional harm." 470 U.S. at 307, 105 S.Ct. 1285 (citations omitted). "The *Miranda* exclusionary rule ... serves the Fifth Amendment and sweeps more broadly than the Fifth Amendment itself." *Id.* at 306, 105 S.Ct. 1285. As in *Arizona v. Evans*, therefore, our decision whether to apply the exclusionary rule to suppress a confession should turn in part on its deterrent effect on future police conduct. Viewed against the Court's more recent analysis, *Elstad's* pains to explain the reasonableness of the police's conduct and the complete absence of a coercive environment acquires full meaning. Suppression of the warned confession in *Elstad* would not have deterred police misconduct—significantly, the court found none—or even induced police to take greater care in providing prompt warnings. The situation before us, however, stands in stark contrast, for here the police purposely delayed advising Davis of his rights for a considerable period of time, not only after the police knew *Miranda* mandated that they be given, but even after they had engaged in active and persistent interrogation that had yielded a confession to murder.

In my view, the flagrant violation of *Miranda* that occurred in this case coupled with the closeness in time and circumstance between the first and second confessions require suppression of Davis' second confession.