**Elton R. JONES, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 96–CM–1220.

District of Columbia Court of Appeals.

Argued March 6, 1998.
Decided March 4, 1999 [1].

---

1. The opinions issued March 4, 1999, *Jones v. United States*, 726 A.2d 186 (D.C.1999), are reissued in this amended form.

Christian G. Lamar, Public Defender Service, with whom James Klein and Samia Fam, Public Defender Service, were on the brief, for appellant.

Susan A. Nellor, Assistant United States Attorney, with whom Mary Lou Leary, United States Attorney at the time the brief was filed, and John R. Fisher, and Thomas C. Black, Assistant United States Attorneys, were on the brief, for appellee.

Before SCHWELB and REID, Associate Judges, and MACK, Senior Judge.

ON PETITION FOR REHEARING

MACK, Senior Judge:

In this court, appellant Jones challenges his conviction on one count of possession of a controlled substance (in violation of D.C.Code § 33–541(d)), and the denial of his motion to suppress statements made by him while in custody and before he had been advised of his *Miranda*[2] rights. We agree with his contentions and, therefore, reverse.

I.

Briefly, the facts may be summarized as follows: At the hearing on appellant's pre-

trial motion to suppress, the government called Officer Diane Groomes, who testified that at 9:30 p.m., on a November evening, she was driving a scout car (along with two foot patrolmen) when they saw appellant and two other men (whom Groomes knew "real well") standing on the sidewalk of a narrow one-way street. As the three officers approached in the scout car, they saw appellant drop two ziplock bags at his feet. Officer Groomes quickly stopped the car and within seconds all three officers, in full uniform and armed, alighted and approached the group on the sidewalk.

At the approach of the officers, appellant appeared to panic; he picked up a beer bottle and moved it to his mouth. One of the officers picked up the ziplock bags (each of which contained a white rock) and handed them to Groomes who ordered the two men standing next to appellant to cross to the other side of the street.

Officer Groomes, asked by the motions court if appellant was "free to leave," replied:

[I] believe at that time he knew he was—I mean there's three officers, and I mean he wasn't going to go anywhere. We were around him, so he wasn't free to leave—he's panicking—he was saying that all he does is drink. When he seen us pick it up, he's like all I do is drink.

The three officers surrounded appellant and called for a police unit wagon to conduct a field test.

Thereafter, Officer Groomes was asked on direct examination: "And at that point did he say anything to you?" She responded:

I think he—what I think is that—I mean, he's panicking, he was basically saying that all he does is drink. When he seen us pick it up, he's like all I do is drink—.... [B]asically he stated to us at the scene that basically all he does is

2. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

drink, and that, you know, spontaneously he goes, he was holding for those two guys. And then in the meantime as we were waiting for the field test, I think then we started like asking him question[s] like, you know, where he brought it from. But he, you know, didn't want to [say] anything about that . . . .

Officer Groomes continued:

And then in the meantime as we were waiting for the field test, I think then we started asking him questions, like you know, if he knew, you know, where he brought it from, who he bought it from. But he you know didn't want to say anything about that.

\* \* \* \* \* \*

We might have asked like, you know, for his ID and his name and everything. While waiting for the field test, we were kind of asking him if he wanted to volunteer information on who he brought it from, stuff like that.

At the beginning of cross-examination by defense counsel, the motions court interrupted to make the initial observation that it would repeat throughout—that it was prepared to find that appellant was in police custody, that the officer had indicated as much and that defense counsel had not raised a Fourth Amendment ground for suppression. The court suggested to counsel that the questioning focus upon the "timing" with respect to any incriminating statement made as a result of interrogation. Thereafter, Officer Groomes, in answer to questioning, admitted that at this time the officers had been focusing on the white rocks, not the beer, and that basically what she had testified to earlier was what had happened. She admitted that she could not remember what exact questions the officers asked in the five to ten minutes before the field test officer came.

On redirect, Groomes testified that she could not recall whether she asked a question before the defendant made the incriminating statements. Pressed by the court to clear up her answer, she said, "I believe we asked" for his I.D., his name and address, etc., and added that they were not asking about the source of the drugs at that time. Asked if she were sure of this, she answered, "No," and when again pressed she answered, "We did not."

Thereafter, appellant testified that, following repeated representations by the officers that they would let him go if he just told them where he got the drugs, "I got scared" and said that he got it "from the guys across the street."

After hearing oral arguments, the motions court ruled that it was denying appellant's motion to suppress, concluding: (1) that appellant was in custody at the time he made the alleged statements, (2) that *no Miranda* warnings had been given prior to this time, but (3) that it did "credit" that the statements made by appellant (that he was holding the drugs for someone else) were spontaneous and (presumably) therefore admissible. A bench trial (and conviction) followed immediately before the same judge.

At the beginning of trial, the court advised counsel that there was no need to repeat the (motion) testimony. The prosecutor used appellant's admission (that he was holding the bags for the "two guys" across the street) to convict appellant of possession of drugs.

## II. Interrogation

As our **young** professionals are fond of repeating, "[T]his case is basically straight-forward." What the officers did to Mr. Jones constituted a violation of the procedural safeguards of the *Miranda* rule. In 1966, the Supreme Court thought this rule to be necessary to protect a defendant's Fifth Amendment privilege against *compulsory* self-incrimination during *custodial interrogation;* it requires that an officer taking a suspect into custody must inform that person "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence

of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." 384 U.S. at 479, 86 S.Ct. 1602 (emphasis added).

Despite present-day debated interpretations, the rule remains just as prophylactic as it was in 1966. Thus in 1980, the Supreme Court, examining the scope of custodial interrogation, said in *Rhode Island v. Innis*, 446 U.S. 291, 300–01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980):

> We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning *or its functional equivalent.* That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any *words* or *actions* on the part of police (other than those normally attendant to arrest and custody) that *the police should know* are reasonably likely to elicit an incriminating response from the suspect. [Emphasis supplied; footnotes omitted.]

The court further noted that "[i]nterrogation ... must reflect a measure of compulsion above and beyond that inherent in custody itself." *Id.* at 300, 100 S.Ct. 1682. *See also Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).

■ The rule also is clear. The government cannot use statements, whether exculpatory or inculpatory, stemming from *custodial* interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. It is likewise clear that in the instant case Mr. Jones was in custody when he was surrounded by three uniformed armed law enforcement officers under circumstances where a reasonable person would never have believed he was free to leave.

■ In construing the *Innis* "functional equivalent of questioning" prong, we have noted that "interrogation ... requires an objective evaluation of the nor-mally foreseeable effect of [the police officer's conduct], ... which turns on the objective purpose manifested by [the officer]." *Derrington v. United States*, 488 A.2d 1314, 1326 (D.C.1985). In making this objective evaluation, we must "focus[ ] primarily on the perceptions of the subject in order to 'reflect the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police.'" *Id.* (quoting *Innis, supra,* 446 U.S. at 301, 100 S.Ct. 1682). In other words, "whether words or actions of the police are reasonably likely to elicit an incriminating response is measured primarily not by the intent of the police, but by how police action would reasonably be perceived by the suspect." *Morris v. United States*, 469 A.2d 432, 438 (D.C. 1983). If the police should have known the suspect would reasonably perceive that their conduct would instigate an incriminating response, the "functional equivalent of questioning" (*i.e.,* "interrogation") has taken place. *See Derrington, supra,* 488 A.2d at 1326.

We have applied the "functional equivalent of questioning" prong to various factual situations, including: (1) rhetorical questions by officers (*In re E.G.*, 482 A.2d 1243, 1248 (D.C.1984) (holding officer's rhetorical question, "I wonder where the gun and money is," subsequent to legal frisk was reasonably likely to elicit an incriminating response)); (2) questions directed to the victim, but overheard by defendant (*Spann v. United States*, 551 A.2d 1347, 1350–51 (D.C.1988) (holding a victim's unforeseeably loud and accusatory response to an officer's question made in close proximity to defendant was not reasonably likely to elicit an incriminating response)); (3) answers by an officer in response to defendant's continued questions (*Wilson v. United States*, 444 A.2d 25, 28 (D.C.1982) (holding officers' answers to questions initiated by defendant were reasonably likely

to elicit an incriminating response, where the exchange was part of police officers' deliberate strategy)); and (4) exchanges of common place greetings (*Morris, supra,* 469 A.2d at 438 (holding police detective could not have foreseen that a brief exchange of commonplace greetings would prompt defendant to make inculpatory statements)).

In the present case, we must decide whether the police should have known appellant was reasonably likely to offer incriminating statements; we must examine, not only individual events, but a series of events. Here (1) three uniformed police officers quickly exit a marked cruiser when they observe appellant and two other men on the sidewalk of a narrow one-way street; (2) as the officers approach they observe appellant drop two ziplock bags and appear to panic; (3) appellant remains in place as the officers order the other two men across the street; (4) the officers see and retrieve the bags (each of which contains a white rock) inches from appellant's feet and surround him; (5) the officers send for a drug identification unit; they ask appellant to identify himself; and (6) while surrounded by the three officers, appellant stated he was holding the drugs for the guys across the street.

If these officers *should have known* that this sequence of events likely would have compelled inculpatory or exculpatory statements used to incriminate and convict, appellant has been the victim of compulsion, and thus the "custodial interrogation" and the statements were inadmissible at trial.

■ We are acutely aware, and the government reminds us, that in reviewing an appeal from the denial of a motion to suppress, our scope is limited. *Brown v. United States,* 590 A.2d 1008, 1020 (D.C. 1991). We must review the evidence offered at a suppression hearing in a light most favorable to the prevailing party, and

we must draw all reasonable inferences in that party's favor. *Peay v. United States,* 597 A.2d 1318, 1320 (D.C.1991). However, whether the evidence establishes that appellant's statements were taken in violation of his Fifth Amendment rights is a question of law which we consider *de novo. See Brown, supra.*

■ Our *de novo* review of the motions court's application of its findings to *Innis'* legal standard, and subsequent denial of appellant's motion to suppress his incriminating statements, leads us to a different conclusion than the trial court. We believe the officers' conduct constituted the "functional equivalent of questioning" as defined by *Innis.* Specifically, the three officers should have known that their actions in approaching and isolating appellant, retrieving the two plastic drug bags, and immediately asking appellant for identification would likely compel an explanation regarding ownership of the drugs. Moreover, viewed in their entirety, the officers' actions went beyond conduct "normally attendant to arrest and custody." *Innis, supra,* 446 U.S. at 300–01, 100 S.Ct. 1682.

Mr. Jones was not free to leave when isolated and surrounded by three armed (and experienced) officers who had seen him drop the ziplock bags containing white rocks.[3] He should have been given the *Miranda* warnings. The phrase "custodial interrogation" by definition and design aptly describes the necessity for a rule of warning in order to protect the constitutional right against self-incrimination. The very simple recitation, required by that rule, poses no hardship on the law enforcement officers who have reason to curtail a citizen's freedom of movement.

### III. Custody

■ The arguments before us, reflecting exhaustive research, nevertheless prompt us to remind that this is an appeal

---

**3.** Officer Groomes testified that she had made at least 500 drug arrests. As appellant's counsel has noted in this court, the officer was not investigating a crime; she had witnessed a crime.

by Mr. Jones from a conviction following trial. The government, therefore, is placed in the unenviable position of reminding us that "although we are bound to accept the trial court's factual findings," we nevertheless should reject the finding that appellant was in *custody* when interrogated. However, on this record we can-not do so. "Custody" is present for purposes of entitling an individual to *Miranda* warnings only when that person's freedom of movement is curtailed "to the degree associated with formal arrest." *Patton v. United States*, 633 A.2d 800, 815–16 (D.C. 1993).

In *Patton*, we discussed in comprehensive fashion the differences between "seizure" (for Fourth Amendment purposes) and custody (for Fifth Amendment purposes) ruling that the defendant in that case had neither been seized nor taken into custody *because* he had actively sought out the police, had voluntarily cooperated thereafter, and was free to leave (a fact plainly conveyed to the defendant). *Id.* at 816–17. In this case before us, the facts here developed by the government's own witness speak for themselves. The setting and the circumstances compel the conclusion of "custodial interrogation." The police *knew* that appellant was in custody, and the police *knew* that appellant *knew* he was in custody. Indeed, the government's own witness testified *at trial* that appellant was under arrest at the site and was somewhat ambivalent about the question as to whether or not he was handcuffed. The trial court unequivocally held that appellant was in custody when interrogated, and had not been given the *Miranda* warnings. The officer's conduct was the "functional equivalent" of express questioning, which brought forth a statement that the prosecutor used to convict appellant of possession of narcotics at trial.[4] In our capacity to apply the law *de novo*, we find that the *Miranda* rule was violated.

■ In making this decision, we recognize the difficulty that the cases present in ascribing a point on the continuum between coercion and spontaneity. However, in this case the officers' conduct more closely allies with the affirmative police actions associated with the "functional equivalent of questioning," than with the passive and incidental police conduct which permits spontaneity. As the Supreme Court noted in 1985:

> The Fifth Amendment prohibits use by the prosecution in its case in chief only *compelled* testimony. Failure to administer *Miranda* warnings creates a presumption of compulsion. Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda*.

*Elstad, supra,* 470 U.S. at 306–07, 105 S.Ct. 1285 (emphasis in original).[5] Accordingly, we

*Reverse.*

SCHWELB, Associate Judge, dissenting:

My views regarding the legal issues in this appeal are set forth in my separate opinion in *Jones v. United States*, 726 A.2d 186, 190–91 (D.C.1999) (*Jones I*). I adhere to those views, and I continue to believe that the government waived the issue whether Jones was in custody.

**4.** *Miranda* tells us that "no distinction may be drawn between inculpatory statements and statements alleged to be merely exculpatory. If a statement made were in fact truly exculpatory it would, of course, never be used by the prosecution." 384 U.S. at 476–77, 86 S.Ct. 1602.

**5.** We also note that our recent holding in *Davis v. United States*, 724 A.2d 1163 (D.C.

1998), is distinguishable from the present case. Specifically, *Davis* upheld the admissibility of a post-*Miranda* statement, notwithstanding that the police obtained a pre-*Miranda* statement, reasoning that the unwarned statement was voluntary and not coerced. Here, however, appellant did not volunteer a post-*Miranda* statement, following his coerced pre-*Miranda* statement.

In its petition for rehearing or, in the alternative, for rehearing en banc, the government alleges that the majority and concurring opinions in *Jones I* are both predicated on a misapprehension as to the correct sequence of events. Specifically, the government notes the finding by the trial judge that Jones' incriminating remark to the effect that he was holding the drugs for two other men was made spontaneously, and that Jones made this statement *before* the officers asked Jones from whom he had purchased the drugs. Jones' response to the petition essentially concedes the government's point.[1]

If we accept, as we must, the finding that Jones' incriminating statement *preceded* the officers' inquiry as to the source of the drugs, then that statement was not made in response to questioning. Moreover, on this record, the request that Jones identify himself did not, in my opinion, constitute the "functional equivalent of interrogation." *See Rhode Island v. Innis,* 446 U.S. 291, 300–01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *Thomas v. United States,* 731 A.2d 415, 420–21 (D.C.1999). Accordingly, I would affirm Jones' conviction.[2]

---

1. In footnote 2 to her response, counsel for Jones states:

    The government is correct that the majority, in its description of the events, suggests that appellant's statement was made in response to a specific inquiry regarding "from whom he had bought the drugs." *Jones [I],* [726 A.2d at 189]. In fact, as the government notes, the trial court had held that the question about the source of the drugs was asked later, after appellant had already made the statement at issue, and her holding was supported by the record.

    To the extent that this was a misstatement of the facts, however, it had no impact on the court's ruling. . . .

2. In Part III of the majority opinion, my colleagues have accommodated one of the government's concerns by acknowledging that "[c]ustody is present for purposes of entitling an individual to *Miranda* warnings only when that person's freedom of movement is curtailed to the degree associated with formal arrest." (Citing *Patton v. United States,* 633 A.2d 800,.815–16 (D.C.1993)) (internal quotation marks omitted). We recently reiterated this point in *Morris v. United States,* 728 A.2d 1210, 1216 (D.C.1999).